[No. F057802. Fifth Dist. Sept. 1, 2010.]

BRENTON R. SMITH, Plaintiff and Appellant, v.
SELMA COMMUNITY HOSPITAL, Defendant and Respondent.

COUNSEL

Andrews & Hensleigh, Barbara Hensleigh and John J. Aumer for Plaintiff and Appellant.

Manatt, Phelps & Phillips, Barry S. Landsberg, Doreen W. Shenfeld and Joanna S. McCallum for Defendant and Respondent.

OPINION

DAWSON, J.—The governing board of Selma Community Hospital (also SCH) terminated the hospital privileges of Brenton R. Smith, M.D., and Smith filed a petition for writ of mandamus seeking to have his hospital privileges reinstated. Smith prevailed in the writ proceeding and also won when the hospital appealed. (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478 [80 Cal.Rptr.3d 745] [superior court's issuance of writ affirmed].) After the appeal, Smith filed a motion for attorney fees pursuant to

Business and Professions Code section 809.9.[1] The trial court denied the motion, and Smith appealed.

Section 809.9 provides that the court shall award attorney fees "to a substantially prevailing party" in a peer review lawsuit "if the other party's conduct in bringing, defending, or litigating the suit was frivolous, unreasonable, without foundation, or in bad faith." The parties disagree on (1) the interpretation of section 809.9, (2) the proper application of the opinion in *Mir v. Charter Suburban Hospital* (1994) 27 Cal.App.4th 1471 [33 Cal.Rptr.2d 243] (*Mir*), (3) the evidence that is relevant to the determination of bad faith, and (4) whether this court can determine as a matter of law that the hospital's conduct meets one of the four grounds stated in section 809.9.

We conclude that (1) when the conditions contained in section 809.9 are shown, the prevailing party is entitled to attorney fees—that is, the award of fees is not discretionary; (2) the statutory phrase "frivolous, unreasonable, without foundation, or in bad faith" sets forth separate grounds for an award of attorney fees; (3) the terms "frivolous," "unreasonable," and "without foundation" are objective standards that might overlap; (4) the term "bad faith" is a subjective standard concerned with a defendant's motives for defending or litigating a lawsuit; (5) because a defendant's subjective state of mind is usually proven by circumstantial evidence, a defendant's prelitigation conduct and postlitigation conduct are relevant evidence from which inferences can be drawn regarding defendant's motives in defending or litigating a lawsuit; and (6) this matter will be remanded so the legal standard for bad faith adopted in this opinion can be applied to the evidence relevant to that determination.

## BACKGROUND

A fundamental issue in this appeal is the motivation for the conduct of SCH and its affiliates toward Smith. Because motive, which is one aspect of state of mind, usually is shown by circumstantial evidence, we will describe in detail some of the evidence in the record regarding Smith's relationship with SCH and its affiliates.[2]

Smith is a licensed physician with certified specialties in family practice and emergency room medicine. He moved to Fresno County in 1983 and grew his practice until his corporation owned 12 clinics in the Central Valley. Smith's clinics compete with clinics owned by Adventist Health System/West in the same area.

---

[1] All further statutory references are to the Business and Professions Code unless otherwise indicated.

[2] This description of evidence should not be read as setting forth all of the circumstantial evidence from which a trier of fact could draw inferences regarding the state of mind or motive of SCH and its affiliates.

In the 1980's, Smith became a member of the medical staffs of three hospitals, which are now named Selma Community Hospital, Hanford Community Medical Center, and Central Valley General Hospital.

Smith's conflicts with the parent and affiliates of SCH[3] appear to have begun in October 1999 when Smith planned to open a birthing center in Hanford, California, that would have competed directly with the Hanford hospitals. Around that time, Darwin Remboldt (who Smith believed was the chief executive officer of Central Valley General Hospital and an attorney) summoned Smith to a meeting at Remboldt's offices. At that meeting, according to Smith, Remboldt was blunt: "Mr. Remboldt informed me that he was not going to allow me to build the birthing center. Mr. Remboldt said to me: 'Either you become a physician in Kings Health [a Medical Group run by one of (the Hanford) hospitals] or we are going to run you out of town.' "[4]

Then, in mid-2000, a representative of the Hanford hospitals approached Smith with an offer to purchase his practice, which Smith declined. After Smith declined the offer, SCH instituted proceedings to terminate his hospital privileges, claiming Smith had an altercation with a nurse in front of a patient and the patient's family in April 2000. Smith's attorney sent a private investigator to interview the patient and her family, interviews which had not been conducted by SCH. Smith and his attorney submitted the witness statements to SCH and the hospital withdrew the claim and agreed to purge Smith's credential/privilege file of all documents related to the matter.

In late 2001, Remboldt approached Smith again about purchasing his practice. By March 2002, Smith and Central Valley General Hospital had entered into a letter of intent for the hospital's purchase of Smith's practice and clinics for $8 million. Among other things, the letter of intent provided that Smith would be paid for managing the clinics and consulting with the Hanford hospitals after the purchase and that he could not compete with them.

During the due diligence period specified in the letter of intent, Central Valley General Hospital became concerned with alleged billing irregularities at Smith's clinics. About this time (late Mar. 2002), a subcommittee of the medical executive committee of the Hanford hospitals convened and was

---

[3] The parent company, Adventist Health System/West, owns many hospitals, including SCH, Hanford Community Medical Center, and Central Valley General Hospital (collectively, Adventist Health). For purposes of this opinion, we will refer to Hanford Community Medical Center and Central Valley General Hospital, both of which are located in Hanford, as the Hanford hospitals.

[4] The threat of "join us or suffer the consequences" is not new in the medical profession. (See, e.g., *Patrick v. Burget* (1988) 486 U.S. 94 [100 L.Ed.2d 83, 108 S.Ct. 1658].)

charged with investigating a series of complaints against Smith. The complaints included allegations of unprofessional conduct, disruptive behavior, abuse of staff, falsification of medical records, and substandard patient care. Smith contends these charges were pursued to gain leverage in the purchase of his clinics and thereby eliminate him as a competitor.[5]

On May 31, 2002, Smith met with representatives of Adventist Health about the sale. They demanded changes in the terms of purchase to make them significantly more favorable to Central Valley General Hospital, including the elimination of payments to Smith for management and consulting services and prohibiting Smith from practicing medicine in Fresno and Kings Counties. Smith rejected the offer.

Immediately after the meeting, Adventist Health terminated contracts with Smith for the provision of emergency room and clinic services, which represented over $1 million in revenue to his practice, and a management agreement. Adventist Health also accused Smith of systematic billing fraud.

Also near the time of the meeting, Adventist Health sent Smith a letter accusing him of using foul language in speaking to a nurse in front of a patient. As he did in response to SCH's accusation in mid-2000, Smith hired an investigator who interviewed the patient who stated the alleged incident never happened. As with the mid-2000 accusation, the hospital had not interviewed the patient about the alleged incident.

On June 26, 2002, Smith attended a meeting with representatives of Adventist Health and its lawyers. They offered to purchase Smith's practice on the same terms presented to Smith about a month earlier and told him the terms were not negotiable. Again, Smith rejected the offer.

On July 2, 2002, before the discussions concerning the sale of Smith's clinics were terminated,[6] the Hanford hospitals orally informed Smith that his privileges had been suspended and he had been granted temporary privileges until July 9, 2002.

On Friday, July 5, 2002, according to Smith, he met with Remboldt about the sale of Smith's clinics. Remboldt mentioned Smith's retirement, his

---

[5] In Smith's view, Adventist Health pursued a course of action designed to eliminate him as a competitor. Adventist Health started by telling him to join their medical group or be run out of town. Next, it offered to buy him out. When that offer was rejected, it attempted to revoke his privileges at SCH. When that attempt failed, it reverted to the plan of buying out his practice.

[6] The discussions were heated. For instance, according to Smith, Adventist Health told him that it would see him in a federal penitentiary within six months. (*Smith v. Adventist Health System/West* (2010) 182 Cal.App.4th 729, 734 [106 Cal.Rptr.3d 318].)

financial security, recognition of Smith's contributions to the community, the placement of a plaque to Smith in the nursery of a planned new birthing hospital, job security for Smith's employees, and the continued operation of the clinics he started. Remboldt also told Smith that Adventist Health had set aside $5 to $7 million to complete the acquisition of his practice. Remboldt told Smith they needed to wrap up the sale and emphasized the need for Smith to call Adventist Health's representative before the close of business on July 8, 2002, which was the day before the decision was to be made about extending Smith's privileges. Remboldt told Smith the offer to acquire his practice essentially was a take it or leave it, nonnegotiable offer that would expire on Monday, July 8, 2002.

Smith left the meeting with the belief that the purpose of the meeting had been to force him to sell his practice on the terms offered or face the loss of his privileges. Smith did not intend to sell on those terms and, fearing the loss of his privileges and practice, he instructed his attorney to seek a temporary restraining order.

On July 8, 2002, Smith filed in Kings County a verified complaint for preliminary and permanent injunctive relief that requested the Hanford hospitals be enjoined from terminating or suspending his privileges unless they first afforded him fair procedure rights in accordance with section 809 et seq.

On July 9, 2002, the parties stipulated in open court that, in lieu of obtaining a ruling from the superior court on the merits of the temporary restraining order requested by Smith, the superior court would enter the following order: "The [Hanford] hospital[s] will do nothing to revoke, suspend or modify Dr. Smith's staff privileges prior to September 30, 2002, unless such modification, revocation or suspension is in full compliance with . . . Section 809, et seq."

After the court hearing, Smith received a letter from the Hanford hospitals questioning the medical care he provided to a patient who had been discharged in January 2000, approximately two and a half years earlier.

Two days after the stipulation was entered, Central Valley General Hospital sued Smith over the sale of the clinics and sought the return of $250,000 delivered to Smith when the letter of intent was executed.[7] (See *Central Valley General Hospital v. Smith, supra,* 162 Cal.App.4th at p. 510.)

---

[7] Smith cross-complained against Central Valley General Hospital, alleging unfair business practices and seeking an injunction to ensure the return and confidentiality of patient records. The lawsuit was decided by a referee who determined that (1) neither side had proven its claims and (2) an injunction should be issued directing Central Valley General Hospital and its affiliates to return confidential materials to Smith. In *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501 [75 Cal.Rptr.3d 771], this court remanded the lawsuit to the

Later in July 2002, Smith attempted to learn the reasons for the allegations regarding his care of the patient discharged in January 2000. His efforts led to a July 30, 2002, telephone conversation between his lawyer and a lawyer representing the medical staff. The declaration of Smith's attorney described the telephone conversation as including a threat: "Ms. van Hall said to me: 'Dr. Smith should be careful what he asks for in requesting to know the basis of the charges against him.' She said when the [medical executive] committee makes charges those charges will be reportable to the National Practitioner Data Bank even if Dr. Smith thereafter sells his practice and later withdraws his application for reappointment. Ms. van Hall told me that if Dr. Smith sells his practice before the [medical executive] committee provides Dr. Smith with the charges that the charges will not be reportable. It was my impression that the phone call from Ms. van Hall was for the purpose of threatening Dr. Smith that if he did not sell his practice to [Adventist Health], they were going to ruin him by taking away his hospital privileges."

The next day, Smith's attorney had a telephone conference with attorneys and consultants representing Adventist Health. Again, Smith's attorney was informed about the timing of the notice of charges and the related reporting obligation. In addition, Ms. van Hall stated: "If [Smith] waits to sell his practice until after the Ad Hoc committee provides [him] with notice of the charges against him, by law, the hospitals would be obligated to report the proposed disciplinary action to the Medical Board of California."

The referenced ad hoc committee was appointed by the medical executive committee of the consolidated medical staffs of the Hanford hospitals for the purpose of continuing the investigation of Smith.[8] A letter dated August 19, 2002, advised Smith that the ad hoc committee had identified a number of concerns, that he could submit a written response and appear for a personal interview, and that he should submit a written plan of correction to address the problems and deficiencies noted in an enclosure.

Smith sought a temporary restraining order to prevent the Hanford hospitals from limiting or restricting his privileges based on the grounds identified

---

superior court for further proceedings. Those proceedings on remand were delayed by the death of the first referee. Recently, however, a subsequent referee issued a "Final Statement of Decision Following Appeal and Remand" dated June 24, 2010.

SCH has requested this court to take judicial notice of the decision, which it characterizes as containing findings of multiple and knowing instances of Smith's double billing to the federal and state governments. The request for judicial notice is denied because the statement of decision (1) was not before the trial court when it decided the attorney fees motion, (2) is not dispositive of any issue decided in this appeal, and (3) is not a final decision for purposes of claim or issue preclusion.

[8] Smith notes that the letter of intent for the sale of his clinics was signed on behalf of Central Valley General Hospital by Roger Rieger, who is not a physician, and that Rieger became a member of the ad hoc committee convened to evaluate his medical care.

in the August 19, 2002, letter. On September 10, 2002, the superior court filed an order denying Smith's application for temporary restraining order. The superior court stated it would not enjoin the peer review process and that there were other remedies for the concerns raised by Smith about the process. Despite its denial of Smith's application, the superior court characterized as "troubling" Central Valley General Hospital's "using the possibility of loss of hospital privileges as a bargaining chip in its efforts to secure favorable terms for the purchase of the licentiate's practice . . . ."

Also on September 10, 2002, the medical executive committee of the Hanford hospitals voted to summarily suspend Smith's privileges. The incidents relied upon for the summary suspension occurred in August 2002 and involved six patient charts.

Smith notified SCH once he learned of his summary suspension at the Hanford hospitals. On September 12, 2002, Stanley Louie, D.O., the chief of staff of SCH, wrote to both Smith and the chief of staff at the Hanford hospitals to request written information explaining the reasons for the suspension.

Smith responded by letter and included the written opinions of two doctors who had reviewed the six patient charts. The Hanford hospitals did not respond to SCH's request. Based on the information provided and Smith's practice at SCH, Dr. Louie did not believe that Smith posed an imminent danger to patients at SCH and did not feel the need to investigate or take other action at that point. As a result, SCH took no action to limit Smith's privileges at SCH, and Smith moved all of his hospital cases to SCH, delivering about 40 babies a month.

In October 2002, the medical executive committee of the Hanford hospitals reviewed the report of the investigation of Smith and voted to continue his summary suspension and to deny his reappointment. The matter then went before the judicial review committee of the Hanford hospitals. Its formal hearing took place over 10 sessions beginning on April 30, 2003, and ending September 28, 2003.

In May 2003, while the judicial review committee proceeding was pending at the Hanford hospitals, Smith applied for reappointment to the medical staff at SCH because his two-year appointment was scheduled to expire.

Dr. Louie testified that, in accordance with its bylaws, SCH conducted a review when it evaluated Smith's application.[9] The June 12, 2003, minutes of

---

[9] This testimony was given at the SCH judicial review committee hearing on February 15, 2005.

SCH's medical executive committee included its recommendation that the credentials committee evaluate Smith's application without information from the Hanford hospitals. As a result, the credentials committee recommended the reappointment of Smith based only on his activity and outcomes at SCH and left open a review of his privileges upon receipt of additional information.

In July 2003, notwithstanding his summary suspension by the Hanford hospitals, SCH notified Smith that the governing board of SCH "ratified the approval of your reappointment to the Active Medical Staff for the next two year period, ending June 25, 2005."

Meanwhile, the judicial review committee of the Hanford hospitals completed its proceedings. In November 2003, it issued its decision and report on the charges of Smith's substandard patient care, abusive behavior towards patients and staff, and falsification of records, from January 1, 2000, to August 19, 2002.

The decision and report listed 23 of the 34 instances of alleged substandard care as proven, eight as proven in part, two as not proven and one as proven, but of minimal importance. Seven out of 26 charges of abusive behavior were listed as not proven. Five charges of falsification of records were listed as proven, two were listed as not proven, two were listed as proven with extenuating circumstances, and one was listed as proven but not serious.[10]

Based on these findings, the judicial review committee of the Hanford hospitals found that the summary suspension of Smith and the recommendation that he not be reappointed were reasonable and warranted.

In November 2003, Smith provided SCH with a copy of the decision of the judicial review committee of the Hanford hospitals.

In December 2003, Smith notified SCH that he was going to take a 90-day leave of absence from the medical staff of SCH, starting January 1, 2004. Smith took the leave of absence to help with the lawsuit concerning Central Valley General Hospital's failed attempt to purchase his practice.[11]

Also in December 2003, Smith appealed the decision of the judicial review committee to the appeal board of the Hanford hospitals. Smith's ground for

---

[10] The matters reviewed by the judicial review committee also were considered by the Medical Board of California, which issued a decision in 2008. The Medical Board of California ruled in favor of Smith, and some of its conclusions are quoted in *Smith v. Adventist Health System/West, supra,* 182 Cal.App.4th at page 737.

[11] The 18-day trial in that lawsuit began in October 2003 and ended in February 2004. (*Central Valley General Hospital v. Smith, supra,* 162 Cal.App.4th at p. 510.)

appeal was substantial noncompliance with the procedures required by statute and by the bylaws of the medical staff of the Hanford hospitals. Among other things, Smith asserted that an unbiased panel had not presided over the hearing and that he had not been given an opportunity to present all relevant evidence of the matters charged.

On January 27, 2004, the governing board of Hanford Community Medical Center affirmed the decision of the consolidated judicial review committee of the Hanford hospitals. On February 6, 2004, the governing board of Central Valley General Hospital affirmed the same decision. The written decisions of the governing boards were the final peer review decisions of the Hanford hospitals, and both stated they became effective January 28, 2004.

In February 2004, Smith requested reinstatement to SCH's medical staff with his prior privileges. SCH requested and received from Smith a copy of the governing boards' final decisions in the Hanford peer review proceeding. Smith also provided SCH with a copy of a letter from his attorney stating that, within the next month, she anticipated filing a petition for writ of mandamus challenging the final administrative decision of the Hanford hospitals' peer review proceeding.[12]

On March 15, 2004, Smith met with Darrick Wells, M.D., who had replaced Dr. Louie as chief of staff at SCH. Dr. Wells told Smith that his privileges would be summarily suspended if he did not resign his membership or request an additional leave of nine months. After that meeting, Smith sent Dr. Wells a confirming letter, which stated: "You noted that both you and the MEC [medical executive committee] had received legal advice from both MEC attorney(s) and Hospital attorney(s); that the MEC 'had to' act on the 'final' decision from Hanford and take action."

The letter is consistent with Dr. Winkelman's testimony before SCH's judicial review committee regarding his conversation with Dr. Wells concerning Smith's privileges: "I was told, very clearly, that hospital counsel or MEC counsel or both, that is the counsel that they—that the MEC was getting advice from, had advised the MEC and Dr. Wells that they were obligated to either suspend Dr. Smith's privileges or in some other manner prevent him from practicing here, because of the liability associated with having him continue to practice, due to the action taken at Central Valley General Hospital. And this followed the discussion of the fact that Dr. Wells was not aware of any adverse events at Selma District Hospital that was calling his privileges into question."

---

[12] The petition for writ of mandamus was filed and remained pending until Smith requested its dismissal in January 2008. (*Smith v. Selma Community Hospital, supra*, 164 Cal.App.4th at p. 1520.)

Smith did not resign or request another leave of absence. Consequently, on March 23, 2004, SCH's medical executive committee notified Smith that it had voted to summarily suspend his privileges effective March 27, 2004. Smith sued, challenging the suspension. On April 29, 2004, he obtained a temporary restraining order enjoining SCH from taking any action to suspend, restrict or otherwise impede Smith's staff membership or privileges at SCH.

On May 5, 2004, SCH's medical executive committee met with a representative of SCH's governing board, SCH's director of administration, and Richard Rawson, the president of SCH, who also was president of the Hanford hospitals. The medical executive committee discussed (1) the temporary restraining order, (2) the trial court's view that the information presented was insufficient to demonstrate Smith was a potential threat to patients and staff, and (3) the summons regarding Smith's suit against the hospital for interference with his right to pursue a lawful occupation, intentional interference with prospective business advantage, and unfair competition. SCH's medical executive committee approved making an offer, contingent upon Smith's dismissing with prejudice his lawsuit against SCH in its entirety, to (1) rescind Smith's summary suspension; (2) rescind the recommendation to terminate his medical staff membership and clinical privileges; (3) not use the findings in the Hanford hospitals proceedings as the basis for either future corrective action or denial of reappointment to SCH; (4) base future corrective action against Smith on events occurring after May 5, 2004; and (5) submit corrected reports to the California Medical Board and the National Practitioner Data Bank. Smith did not accept the offer, which he characterizes as a blatant attempt to trade hospital privileges for dismissal of his lawsuit— that is, the use of peer review proceedings as a cudgel to force him to dismiss the suit.

On June 4, 2004, SCH's medical executive committee voted to rescind the summary suspension, which was no longer in operation because of the temporary restraining order, and continue with the recommendation to terminate Smith's medical staff membership and clinical privileges. The written notice of charges that SCH's medical executive committee provided to Smith stated that "the MEC determined that your conduct, as finally determined after extensive hearings at the Hanford hospitals, was reasonably likely to be (1) detrimental to patient safety and to the delivering of quality patient care within the hospital, (2) unethical, (3) contrary to the Medical Staff Bylaws and rules and regulations, and (4) below applicable professional standards."[13]

---

[13] Smith argues that SCH's settlement offer and subsequent decision to pursue termination of his privileges reveal its motives. He contends that the only reasonable inference to be drawn from SCH's willingness to continue his privileges if he dismissed his lawsuit and its

The written notice also advised Smith of SCH's selection of individuals to serve as SCH's judicial review committee. Smith objected to the four individuals on the ground they had significant economic ties to SCH. The hearing officer, retired Judge Frederic A. Jacobus, subsequently sustained the objections and struck the entire panel. A new judicial review committee was formed with physicians who were associated with the Fresno-Madera Medical Society and were not members of SCH's medical staff.

The judicial review committee held hearings in February and March 2005 in which each side called witnesses. For example, Dr. Wells testified at the hearing that over the prior year or 11 months he had been reviewing every one of Smith's charts and admissions to SCH and "[t]here has been no fallout of medical care of those charts to this point." Dr. Wells also testified that he relied on the final decision of the Hanford hospitals, that he would not dispute the findings, and that he was not concerned about the fairness of the proceeding at the Hanford hospitals.

On March 31, 2005, the judicial review committee issued a written decision in Smith's favor. It specifically found that the medical executive committee had not proven by a preponderance of the evidence that its recommendation was reasonable and warranted. Consequently, the judicial review committee rejected the action proposed by SCH's medical executive committee.

The written decision of the judicial review committee discussed the relationship between SCH and the Hanford hospitals, the close relationship between the two Hanford hospitals that terminated Smith's privileges, the failure of the proposed transaction between Smith and one of the Hanford hospitals for the sale of his practice and 12 clinics, the charges and results of the peer review proceedings at the Hanford hospitals, and SCH's medical executive committee's offer to compromise SCH's peer review proceeding against Smith.

The judicial review committee observed that Smith was reappointed to SCH's medical staff in June 2003 (after his suspension by the Hanford hospitals) and that the retrospective peer review of his work at SCH "apparently **did not** identify his clinical practices as an 'outlier.'" The judicial review committee noted that the interval examined by SCH before reappointing Smith was the interval when the events occurred that were the basis for the findings of the Hanford hospitals. As to matters occurring *after* Smith was reappointed to SCH's medical staff in 2003, no outlying outcomes from Smith's practice at SCH were identified in the testimony presented to the judicial review committee.

---

subsequent decision to terminate his privileges is that SCH was not acting "exclusively in the interest of maintaining and enhancing quality patient care." (§ 809.05, subd. (d).)

The judicial review committee's decision included an explanation of its conclusion to reject the recommendation of the medical executive committee: "We do not believe SCH Medial [sic] Staff through its MEC and attorney has produced evidence to convince us that the action of Selma Adventist Hospital MEC is reasonable or warranted. We believe that SCH must do their own investigation of Dr. Smith, and follow accepted guidelines such as those outlined in the model Medical Staff By-Laws as presented by . . . Jack Rötenberg, MD, and California Medical Association. The information from the Hanford hospitals may be used *as a part* of a reason to monitor Dr. Smith by accepted peer review mechanisms such as case monitoring, proctoring at surgery and a more intensive review of patients admitted to SCH. After doing their own investigation of Dr. Smith's performance at SCH, then the experiences at the Hanford hospitals may be used as additional evidence of his need to be dismissed."

In April 2005, SCH's medical executive committee appealed the decision of the judicial review committee to the governing board of SCH. The governing board exercised its authority under its bylaws to appoint a committee composed of three members of the governing board to sit as the appeal board.

The appeal board issued a written document that included its conclusions that (1) the judicial review committee's noncompliance with the procedures required by the bylaws was prejudicial and (2) the judicial review committee's decision was not supported by substantial evidence. Based on these conclusions, the appeal board ultimately recommended "that the Governing Board of Selma Community Hospital reverse the [judicial review committee] and affirm the MEC's recommendation to terminate Dr. Smith's Medical Staff membership and clinical privileges . . . ."

SCH's governing board agreed with the recommendation and adopted a resolution, effective July 7, 2005, implementing the medical executive committee's recommendation to terminate the membership and privileges of Smith. On July 25, 2005, Smith filed the petition for writ of mandamus that started the lawsuit involved in this appeal.

In June 2006, the superior court filed a judgment granting a peremptory writ of mandamus. The writ directed SCH to set aside the decision of the appeal board of July 7, 2005, and reinstate the decision of the judicial review committee. (*Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th at p. 1499.)

On July 12, 2006, SCH filed an appeal. Five days later, it filed a return in the superior court stating it could not comply with the writ because there was

no SCH medical staff to which Smith could return. This statement was based on Adventist Health's reorganization of its hospital subsidiaries and their medical staffs, which had occurred the preceding fall. (*Smith v. Adventist Health System/West, supra,* 182 Cal.App.4th at p. 732.) After that reorganization, the medical staff of the Hanford hospitals and SCH was a single entity.[14] (*Ibid.*)

Within a day or two of filing its return, SCH filed a petition for a writ of supersedeas and a request for an immediate stay with this court. The petition misinterpreted the trial court's decision by asserting it held "that California hospitals may **never** base termination decisions **solely** on a physician's substandard medical care and/or inappropriate behavior at another facility, no matter how egregious."[15] In August 2006, this court denied the petition for a writ, stating that (1) a party seeking a writ must convincingly show that substantial questions will be raised on appeal and must demonstrate it would suffer irreparable harm outweighing the harm that would be suffered by the other party and (2) SCH had failed to carry its burden.

In mid-August 2006, frustrated by SCH's failure to comply with the writ of mandate issued by the trial court, Smith sought to regain his privileges at SCH by filing a motion for issuance of an order to show cause regarding contempt. The trial court held two hearings on the motion.

The controversies raised in the hearings included a dispute over the inferences that should be drawn from this court's denial of SCH's petition for a writ of supersedeas. SCH argued that the fact Smith was not exercising privileges was the basis for this court's finding of no imminent harm to it

---

[14] SCH did not raise the nonexistence of the SCH medical staff prior to the entry of judgment and this failure became the subject of controversy. The trial court's December 5, 2006, order stated: "There also appears to be a question regarding whether respondent [SCH] failed to provide this information [about the reorganization and its ability to comply with the writ of mandamus] to petitioner [Smith] and the court and continued to defend itself, so that [Smith] would continue to expend his resources and waste his time obtaining a meaningless victory." The court's order did not resolve that question.

[15] SCH's interpretation was wrong because it viewed the case as establishing a broad principle instead of a determination specific to the facts presented by Smith's case. Subsequently, we affirmed the trial court, explicitly rejected the broad principle described by SCH, and stated: "[W]e only uphold the judicial review committee's finding that, *in the circumstances of this case,* the results of peer review proceedings at the other hospitals were not enough [to terminate Smith's privileges and staff membership]." (*Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th at p. 1482, italics added.) Our decision to reverse the governing board and uphold the peer review body's findings of fact was consistent with the Legislature's policy statement that "[i]n all peer review matters, the governing body shall give great weight to the actions of peer review bodies . . . ." (§ 809.05, subd. (a); see *Mileikowsky v. West Hills Hospital & Medical Center* (2009) 45 Cal.4th 1259, 1275 [91 Cal.Rptr.3d 516, 203 P.3d 1113].)

and, therefore, the trial court should not reinstate Smith because that would upset the balance struck by this court. The trial court correctly rejected SCH's characterization of this court's order denying the writ.

Besides matters raised at the two hearings, other controversies arose. A week after the second hearing, SCH filed a declaration to support its position that Smith should not be reinstated pursuant to the writ of mandate. The declaration referenced an accusation filed against Smith by the California Medical Board in August 2005 and a criminal investigation conducted by the Attorney General's Office. SCH asked the court to delay ruling until after the Attorney General's Office had decided whether to file criminal charges, which SCH represented would occur in late November or the first week of December 2006.[16]

On December 5, 2006, the trial court issued an order that (1) found no contempt, (2) ordered the reinstatement of the judicial review committee's decision as required by the court's June 15, 2006, writ, (3) directed that Smith submit an application for consolidated medical staff privileges, and (4) ordered that Smith "shall be permitted to practice on the Consolidated Medical Staff at . . . Selma Community Hospital for a period of one (1) year following the submission of his application, and then must reapply for privileges, as would any other physician practicing there."

SCH reacted to this order by filing a second petition for writ of supersedeas and a request for an immediate stay. Four days later, on December 19, 2006, this court denied the petition. As a result, Smith resumed practicing at SCH on December 21, 2006. He points out that his reinstatement had been delayed for almost six months.

In July 2008, this court affirmed the trial court's decision to issue the writ of mandamus, stating: "The governing board's decision includes several errors of law. It misinterpreted the decision of the judicial review committee, misapplied the collateral estoppel or the exhaustion of remedies doctrine, erroneously decided certain evidence was irrelevant, and misapplied the substantial evidence test." (*Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th at p. 1519.)

---

[16] No criminal charges were filed against Smith. (See *Smith v. Adventist Health System/West, supra,* 182 Cal.App.4th at pp. 734, 737.) In 2008, the California Medical Board issued a decision exonerating Smith. The board had considered the most serious of the charges made against Smith by the Hanford hospitals in connection with their termination of his hospital privileges.

## PROCEEDINGS

In December 2008, Smith filed a motion seeking attorney fees in the amount of $117,837.50.

The motion for attorney fees was heard and taken under advisement on February 4, 2009. On April 10, 2009, the trial court issued its order stating the following: "[Smith's] Motion for Attorney's Fees in the amount of $117,837.50 is denied, pursuant to the court's holding in *Mir*[, *supra*,] 27 Cal.App.4th 1471 as the hospital's position was not frivolous, unreasonable, without foundation, or in bad faith pursuant to . . . section 809.9." (Original underscoring.)

In May 2009, Smith filed a timely notice of appeal from the order denying his motion for attorney fees.

## DISCUSSION

The parties dispute how section 809.9 should be interpreted and applied in this case. Part of this dispute concerns the role that the majority opinion in *Mir, supra*, 27 Cal.App.4th 1471 should play in the analysis of these questions. We begin our discussion by setting forth the text of section 809.9 and the rules of statutory construction.

I. *Statutory Text and Rules of Construction*

A. *Statutory Text*

Section 809.9 provides: "In any suit brought to challenge an action taken or a restriction imposed which is required to be reported pursuant to Section 805, the court *shall*, at the conclusion of the action, *award* to a substantially prevailing party the cost of the suit, including a reasonable attorney's fee, *if the other party's conduct in bringing, defending, or litigating the suit was frivolous, unreasonable, without foundation, or in bad faith.* . . . For the purpose of this section, a plaintiff shall not be considered to have substantially prevailed when the plaintiff does not obtain an award of damages or permanent injunctive or declaratory relief." (Italics added.)

B. *Rules of Statutory Construction*

Issues of statutory construction are questions of law subject to independent review by the appellate court. (*Coburn v. Sievert* (2005) 133 Cal.App.4th 1483, 1492 [35 Cal.Rptr.3d 596].) The general principles of statutory construction that guide our independent review have been set forth by this court

in a number of opinions. (E.g., *id.* at pp. 1494–1496; *People v. Haynie* (2004) 116 Cal.App.4th 1224, 1228–1229 [11 Cal.Rptr.3d 163]; *California Teachers Assn. v. Governing Bd. of Hilmar Unified School Dist.* (2002) 95 Cal.App.4th 183, 191 [115 Cal.Rptr.2d 323].) Those principles are summarized here.

A reviewing court's "fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196].) This task begins by scrutinizing the actual words of the statute, giving them their usual, ordinary meaning. (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 476 [66 Cal.Rptr.2d 319, 940 P.2d 906].)

### 1. *Unambiguous Statutory Language*

When statutory language is clear and unambiguous—that is, has only one reasonable construction—courts usually adopt the literal meaning of that language. (*Hughes v. Board of Architectural Examiners* (1998) 17 Cal.4th 763, 775 [72 Cal.Rptr.2d 624, 952 P.2d 641]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) An exception to this general rule exists for situations where a literal construction would frustrate the purpose of the statute or produce absurd consequences. (*Coburn v. Sievert, supra,* 133 Cal.App.4th at p. 1495.)

### 2. *Ambiguous Statutory Language*

When statutory language is ambiguous, courts must " ' "select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and avoid an interpretation that would lead to absurd consequences." [Citation.]' " (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272.)

Courts determine the apparent intent of the Legislature by reading the ambiguous language in light of the statutory scheme rather than reading it in isolation.[17] (*Lungren v. Deukmejian, supra,* 45 Cal.3d at p. 735.) In other words, the ambiguous language must be construed in context, and provisions relating to the same subject matter must be harmonized to the extent possible. (*Ibid.*) In addition, courts may determine the apparent intent of the Legislature by evaluating the ostensible objects to be achieved by the statute and examining the statute's legislative history. (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272.)

---

[17] In this case, the statutory scheme includes the Legislature's findings and declarations set forth in section 809 and its policy statement set forth in section 809.05.

In the present case, the parties have not requested that we examine any legislative history concerning section 809.9.[18]

## II. *Role of* Mir *as Precedent*

### A. *Summary of* Mir

In *Mir, supra*, 27 Cal.App.4th 1471, a hospital's peer review proceeding resulted in disciplinary action against the physician. (*Id.* at p. 1476.) The physician filed a petition for mandamus relief, seeking to vacate the disciplinary decision. The trial court granted the writ, determining that there was no substantial evidence to support the disciplinary decision of the hospital. Also applying the substantial evidence test, the appellate court affirmed the decision of the trial court. (*Id.* at pp. 1476–1477.)

After the appeal of the mandamus proceeding was resolved, the physician filed a motion for attorney fees under section 809.9. (*Mir, supra*, 27 Cal.App.4th at p. 1477.) The trial court granted the motion, concluding that the hospital had opposed mandamus unreasonably and without foundation. The hospital appealed. (*Ibid.*)

The appellate court addressed the following issue: Whether a physician who succeeds on mandamus in overturning a disciplinary action by a hospital on the ground of insufficient evidence is necessarily entitled to recover attorney fees under section 809.9. (*Mir, supra*, 27 Cal.App.4th at p. 1475.) The majority concluded the determination that no substantial evidence supported the hospital's disciplinary decision did not automatically establish that the hospital's defense of the mandamus proceeding was unreasonable or without foundation so as to merit an award of attorney fees. Based on this conclusion, the majority reversed the order awarding attorney fees and remanded the matter for a new hearing on the issue whether the hospital's opposition to mandamus was unreasonable or without foundation. (*Id.* at pp. 1486–1488.)

### B. *Contentions of the Parties Here*

At the hearing on the motion for attorney fees here, counsel for Smith argued that the judicial review committee's finding (that SCH's proposed termination of Smith's privileges had not been shown to be reasonable and warranted for purposes of § 809.3, subd. (b)(3)) established by res judicata or collateral estoppel that the hospital's defense of the mandamus proceeding

---

[18] Courts and practitioners comparing this opinion to *Mir, supra*, 27 Cal.App.4th 1471, a case where legislative history was presented to the court, should be aware of this difference.

was unreasonable for purposes of section 809.9. Counsel also argued *Mir* was distinguishable because it involved the lack of substantial evidence to support the disciplinary action.

At the same hearing, counsel for SCH argued Smith's case was on all fours with *Mir*, and the trial court was required by *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] to follow that precedent. He argued that, in effect, counsel for Smith was asking the trial court to overrule *Mir* and agree with Justice Croskey's dissent in that case.

## C. *Precedential Value of* Mir

The court in *Mir* decided a narrow legal issue: Whether a court's decision that a hospital's disciplinary decision was not supported by substantial evidence *automatically* results in the conclusion that the hospital's position was "unreasonable" or "without foundation" for purposes of section 809.9. (*Mir, supra,* 27 Cal.App.4th at pp. 1475, 1481–1482.) The majority opinion concluded that "[a] finding of insufficient evidence is not tantamount to an *affirmative* finding the Hospital's conduct in resisting mandamus was unreasonable or without foundation." (*Id.* at p. 1483.)

Here the question presented is different. Smith does not rely on a court determination that the hospital's disciplinary decision was not supported by substantial evidence. Rather, Smith relies on the determination of the judicial review committee that acted as the trier of fact in the peer review proceeding conducted by SCH. (See *Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th at p. 1481.) And the determination made by that judicial review committee, as the trier of fact, did not involve the application of the substantial evidence test. Smith relies on the judicial review committee's determination under section 809.3, subdivision (b)(3):[19] "We do not believe SCH Medical Staff through its MEC and attorney has produced evidence to convince us that the action of Selma Adventist Hospital MEC is reasonable or warranted." The judicial review committee reiterated its finding on the question of ultimate fact by stating: "In our view, the SCH MEC did not '. . . **persuade this JRC, by a** *preponderance of the evidence,* that its action or recommendation (summary suspension/removal from the SCH staff) is/was reasonable and warranted.' "

Based on our comparison of the determination regarding substantial evidence relied upon by the physician in *Mir* with the judicial review committee's determination relied upon by Smith, we conclude that the legal issue

---

[19] Section 809.3, subdivision (b)(3) provides that "the peer review body shall bear the burden of persuading the trier of fact by a preponderance of the evidence that the action or recommendation is reasonable and warranted."

presented in this case is not the same as that decided in *Mir*. A finding regarding the "reasonable and warranted" requirement in section 809.3, subdivision (b)(3) is not the same as a conclusion of law that a disciplinary decision is not supported by substantial evidence.[20] Accordingly, *Mir* is not binding precedent in this case.[21]

Based on our conclusion that *Mir* is not binding precedent, we further conclude that the question whether the judicial review committee's finding here *entitles* Smith to attorney fees under section 809.9, as a matter of law, must be resolved by applying the requirements of the legal doctrine of collateral estoppel. Smith argues the judicial review committee's finding collaterally estops SCH from asserting that its defense of the mandamus proceeding was reasonable and warranted.

## III. *Collateral Estoppel and the Judicial Review Committee's Findings*

### A. *Background and Contentions*

The peer review proceeding prosecuted against Smith by SCH was governed in part by section 809.3, subdivision (b)(3), which provides that "the peer review body shall bear the burden of persuading the trier of fact by a preponderance of the evidence that the action or recommendation is reasonable and warranted." In the Smith matter, the peer review body was SCH's medical executive committee and the trier of fact was the judicial review committee. Thus, SCH's medical executive committee had the burden of persuading the judicial review committee that its recommendation to terminate Smith's privileges was reasonable and warranted.

The judicial review committee specifically found that the medical executive committee had not persuaded it by a preponderance of the evidence that the proposed termination of Smith's privileges was reasonable and warranted. This is the finding that Smith argues now binds SCH and entitles him to attorney fees as a matter of law. Relying on the doctrine of collateral estoppel, Smith argues: "If SCH's proposed conduct to terminate Smith's privileges was unreasonable, then *ergo* its subsequent conduct in terminating Smith's privileges despite the [judicial review committee] decision was unreasonable. Likewise, its subsequent defense of its unreasonable conduct in

---

[20] "Whether substantial evidence exists to support the administrative decision is a question of law." (*Angelier v. State Board of Pharmacy* (1997) 58 Cal.App.4th 592, 598, fn. 5 [68 Cal.Rptr.2d 213].)

[21] As a result of this conclusion, this opinion should not be read as implying that we have taken a position on the legal question that caused the disagreement between the majority opinion and the dissenting opinion in *Mir*.

response to Smith's writ petition was unreasonable or without foundation. Accordingly, Smith is entitled to his attorneys' fees under Section 809.9, as a matter of law."

In response, SCH contends that the judicial review committee's finding cannot bind the trial court in the fee determination because the judicial review committee considered and decided a completely different question.

## B. *Application of Doctrine of Collateral Estoppel*

■ The doctrine of collateral estoppel applies only if the following elements have been shown: "First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. [Citations.]" (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 341 [272 Cal.Rptr. 767, 795 P.2d 1223].)

The doctrine of collateral estoppel is designed to limit "litigation by preventing a party who has had 'one fair adversary hearing' on an issue from again drawing it into controversy." (Heiser, *California's Confusing Collateral Estoppel (Issue Preclusion) Doctrine* (1998) 35 San Diego L.Rev. 509, 528.) Three public policies are served by the doctrine—namely, "preservation of the integrity of the judicial system, promotion of judicial economy, and protection of litigants from harassment by vexatious litigation." (*Lucido v. Superior Court, supra,* 51 Cal.3d at p. 343.)

■ In this appeal, the parties dispute whether the identical issue was litigated. The "identical issue" element requires that " 'identical factual allegations' are at stake in the two proceedings, not whether the ultimate issues or dispositions are the same." (*Lucido v. Superior Court, supra,* 51 Cal.3d at p. 342.)

We conclude the judicial review committee did not decide the identical issue that was presented to the trial court by Smith's motion for attorney fees. The issue decided by the judicial review committee was whether it was persuaded by a preponderance of the evidence that the proposal by SCH's medical executive committee to terminate Smith's privileges and membership was reasonable and warranted. The issue presented by the motion for attorney fees was whether SCH's conduct in defending or litigating the mandamus proceeding was unreasonable or without foundation. Although the former issue is intertwined with the latter, they are not identical.

Whether SCH's conduct in defending or litigating the mandamus suit was reasonable depends in part on the positions it took during the litigation. As these facts did not exist at the time the judicial review committee made its decision, identical factual allegations were not at stake in the two proceedings.

The lack of identity between the issues is further demonstrated by the judicial review committee's phrasing its finding in terms of what the preponderance of the evidence showed and whether it was persuaded. The issue of whether the medical executive committee carried its burden of persuasion is not the same issue that determines whether SCH was liable for attorney fees.

Accordingly, we reject Smith's contention that, when the trial court decided his motion for attorney fees, it was required by the judicial review committee's finding regarding reasonableness to find that SCH's conduct in defending or litigating Smith's lawsuit was "unreasonable" for purposes of section 809.9.

## IV. *Duty or Discretion of the Trial Court*

### A. *Contentions*

SCH contends an abuse of discretion standard of review applies to the trial court's denial of attorney fees. It also contends the trial court's determinations regarding the factors set forth in section 809.9 are findings of fact that should be reviewed for an abuse of discretion. In contrast, Smith contends the application of section 809.9 in this case is subject to de novo review because the relevant facts are undisputed.

### B. *Analysis*

The question whether section 809.9 grants discretionary authority to award attorney fees is a question of statutory construction. The language in section 809.9 is not ambiguous on the question whether the award of fees is mandatory or discretionary. The Legislature's use of the phrase "court shall . . . award" in section 809.9 plainly indicates that the trial court is required to award attorney fees when the criteria set forth in the statute are satisfied. (§ 19; see *County of Sacramento v. Superior Court* (1971) 20 Cal.App.3d 469, 472 [97 Cal.Rptr. 771] [usually "shall" connotes mandatory action and "may" connotes discretionary action].)

SCH has not discussed the Legislature's use of the word "shall" in section 809.9 and has cited *Cummings v. Benco Building Services* (1992) 11 Cal.App.4th 1383 [15 Cal.Rptr.2d 53] to support its position that an abuse of discretion standard applies. The *Cummings* case involved the attorney fees

provision in the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12965). (*Cummings*, at p. 1386.) That section states "the court, in its discretion, may award to the prevailing party reasonable attorney's fees and costs . . . ." (Gov. Code, § 12965, subd. (b).) The phrase "in its discretion may" plainly grants discretion to the trial court and easily is distinguished from section 809.9's mandatory language. Therefore, the court's conclusion in *Cummings* that an abuse of discretion standard applied to an attorney fees award under the FEHA has no value as precedent in this case. (See also Code Civ. Proc., § 128.5 ["trial court may order a party" to pay sanctions]; *Tenderloin Housing Clinic, Inc. v. Sparks* (1992) 8 Cal.App.4th 299, 304 [10 Cal.Rptr.2d 371] ["award of sanctions under [Code Civ. Proc., §] 128.5 is a discretionary act on the part of the trial court"].)

Similarly, the two federal decisions cited by SCH that state a district court's decision to award attorney fees under the Health Care Quality Improvement Act of 1986 (42 U.S.C. §§ 11101–11152) is reviewed for an abuse of discretion are not persuasive authority for how section 809.9 should be construed. (See *Smith v. Ricks* (9th Cir. 1994) 31 F.3d 1478, 1487; *Johnson v. Nyack Hospital* (2d Cir. 1992) 964 F.2d 116, 123.) Those decisions contain no textual analysis of the federal attorney fee provision and fail to acknowledge that the provision, like section 809.9, uses the word "shall."[22]

█ Based on the plain language of the statute, we interpret section 809.9 as imposing a mandatory obligation on trial courts to award attorney fees

---

[22] These cases illustrate that the California Legislature's concern about "possible adverse interpretations by the courts of the federal act" was not unfounded. (§ 809, subd. (a)(2).) This concern and deficiencies in the Health Care Quality Improvement Act of 1986 (42 U.S.C. § 11101 et seq.) caused the Legislature to state "it is preferable for California to 'opt-out' of the federal act and design its own peer review system." (§ 809, subd. (a)(2).) In addition, the Legislature found and declared: "[T]he laws of this state pertaining to the peer review of healing arts practitioners shall apply in lieu of Section 11101 and following of Title 42 of the United States Code, because the laws of this state provide a more careful articulation of the protections for both those undertaking peer review activity and those subject to review, and better integrate public and private systems of peer review. Therefore, California exercises its right to opt out of specified provisions of the Health Care Quality Improvement Act relating to professional review actions, pursuant to Section 11111(c)(2)(B) of Title 42 of the United States Code. This election shall not affect the availability of any immunity under California law." (§ 809, subd. (a)(9)(A).)

We recognize that a few months after California's peer review legislation became effective, Congress amended the federal statute to repeal the so-called opt out provision. (See Pub.L. No. 101-239, § 6103(e)(6)(A) (Dec. 19, 1989) 103 Stat. 2106, 2208.) Notwithstanding Congress's amendment, the foregoing explicit findings by the Legislature and the textual differences between section 809.9 and the federal attorney fees provisions lead us to conclude that the federal case law and the federal legislative history are poor guides for determining the intent and purpose of the California Legislature in enacting section 809.9. Consequently, we have not relied on the federal materials in deciding the meaning of section 809.9.

when the criteria set forth in the statute are satisfied. Therefore, we will not review the trial court's denial of attorney fees under the deferential abuse of discretion standard of review. Instead, we will subject questions of law to an independent review and will review findings of fact under the substantial evidence test, except where those findings can be made as a matter of law.

## V. *Conduct That Is the Basis for an Award of Attorney Fees*

SCH interprets Smith's attorney fees motion as including conduct that took place prior to and during the peer review process underlying the mandamus action. SCH argues that "Smith is seeking his attorneys' fees for prosecution of the mandamus action as damages for alleged 'bad faith peer review.' But he is in the wrong forum, and using the wrong vehicle."

SCH made the same argument below. There, SCH also argued that the temporary restraining orders and preliminary injunctions that Smith obtained in other cases established "nothing about the alleged invalidity of [SCH]'s litigation position in this case." SCH's written opposition to the section 809.9 motion concluded: "Finally, Smith offers, as 'evidence' that [SCH]'s defense of the mandamus petition was frivolous or in bad faith, the fact that 'at three different stages, adjudicators have expressed concern about economics driving the illegal privileging decisions.' (Motion at 10:5–15.) But again, *if* Smith has been subjected to bad faith peer review (and he has not), that is not before this Court. The sole issue before this Court is whether certain litigation conduct of [SCH] is sanctionable within the meaning of Section 809.9."

Smith replies that section 809.9 applies to more than litigation conduct because its plain terms also apply to the decision to defend the lawsuit. Smith does not argue that he is entitled to recover attorney fees incurred in the peer review proceeding or in other lawsuits against SCH or its affiliates.

■ The pertinent statutory language states that an award of attorney fees against a defendant is based on the defendant's "conduct in . . . defending, or litigating the suit . . . ."[23] (§ 809.9.) We conclude that the Legislature's use of the terms "defending" and "litigating" in tandem demonstrates it was concerned with both the general and the specific. The phrase "conduct in . . . defending" reflects a concern with the broad decision to defend a lawsuit, just as the phrase "conduct in bringing" reflects a concern with the plaintiff's

---

[23] The reference to "the suit" unambiguously refers back to the prepositional phrase that begins section 809.9—namely: "In any suit brought to challenge an action taken or a restriction imposed which is required to be reported pursuant to Section 805 . . . ." The term "any suit" includes the "judicial review under Section 1094.5 of the Code of Civil Procedure" mentioned in section 809.8. (See *Mir, supra,* 27 Cal.App.4th at pp. 1480–1481 [petition for writ of mandate is a "suit" for purposes of § 809.9].)

broad decision to pursue a lawsuit. The phrase "conduct in . . . litigating the suit" indicates a concern with the specific tactical decisions made as the suit proceeds.

In the context of this case and the arguments raised by Smith, we conclude that the phrase "conduct in . . . defending . . . the suit" includes SCH's decision to defend the petition for writ of mandate filed by Smith. Consequently, that decision must be evaluated to determine if it meets any of the four grounds listed in section 809.9. In addition, we conclude that conduct in litigating the suit includes acts taken on specific issues and motions, as well as on postjudgment matters, such as SCH's claim that it no longer had a medical staff to which Smith could return and its two unsuccessful writs of supersedeas filed with this court. The attorney fees incurred by Smith in connection with such postjudgment matters would be recoverable as part of any fees awarded under section 809.9.

Because of SCH's arguments about prelitigation conduct, however, we explicitly state that any attorney fees awarded to a plaintiff under section 809.9 must have been incurred by the plaintiff in "the suit" referenced in the statute. Thus, attorney fees incurred by Smith before this suit was filed, or in other matters, cannot be recovered in the section 809.9 motion he filed in this case. At the same time, this conclusion does not mean that SCH's conduct outside the suit does not constitute evidence relevant to the application of section 809.9 in this case. SCH's argument about relevancy will be addressed in part VI.F.5., *post.*

VI. *Meaning of the Statutory Phrase "Frivolous, Unreasonable, Without Foundation, or in Bad Faith"*

Before applying section 809.9 to SCH's conduct in defending or litigating the mandamus proceeding and determining whether Smith is entitled to a fee award, we first determine the meaning of the applicable statutory terms.

■ Section 809.9 requires an award of attorney fees where the losing defendant's conduct in defending or litigating the suit "was frivolous, unreasonable, without foundation, or in bad faith."

A. *The Four Grounds for an Award Are Separate*

Smith contends that section 809.9 requires "the court to award attorneys' fees to the substantially prevailing party under four alternative grounds . . . ." Based on the statute's use of the disjunctive "or," Smith argues that "[e]ach alternative ground represents a separate category for an award . . . ."

■ The plain and ordinary meaning of the word "or" is well established. When used in a statute, the word "or" indicates an intention to designate separate, disjunctive categories. (*White v. County of Sacramento* (1982) 31 Cal.3d 676, 680 [183 Cal.Rptr. 520, 646 P.2d 191]; see *Kobzoff v. Los Angeles County Harbor/UCLA Medical Center* (1998) 19 Cal.4th 851, 861 [80 Cal.Rptr.2d 803, 968 P.2d 514] ["or" is disjunctive].) ■ Therefore, the use of "or" in section 809.9 means that an award of attorney fees to a substantially prevailing party is required if any one of the four grounds listed is shown.

B. *Overview of the Four Grounds and Their Relationship to One Another*

■ The four criteria for an award of fees listed in section 809.9 are not defined by the statute. They are general terms subject to a variety of interpretations, which range from narrow to broad. Because of the lack of statutory definitions and the inherent ambiguity of the four terms, it is difficult to determine precisely where one term ends and another term begins and what overlap, if any, exists among them.

This set of circumstances leads us to draw two pragmatic inferences regarding legislative intent. First, the Legislature used the four terms together and connected them with the disjunctive "or" to avoid any single term being interpreted too narrowly. Thus, from a practical point of view, the scope of a particular term is not as important as the scope of the statute. For example, whether a particular position is characterized as unreasonable, without foundation, or both is not as important as whether that position falls within the scope of section 809.9. (See the last paragraph of pt. VI.D., *post*.)

Second, the Legislature intended to impose liability for attorney fees if the relevant conduct was either qualitatively deficient under an objective standard or inappropriate under a subjective standard. This point is discussed further in part VI.F., *post*, which concerns the ground of bad faith.

C. *Without Foundation*

■ In scrutinizing the words of a statute, courts generally give them their usual, ordinary meaning, which in turn may be obtained by referring to a dictionary. (*Garcia v. McCutchen, supra*, 16 Cal.4th at p. 476; *Wal-Mart Stores, Inc. v. City of Turlock* (2006) 138 Cal.App.4th 273, 294 [41 Cal.Rptr.3d 420].) Webster's Third New International Dictionary (1986) page 898 defines "foundation" to mean "the basis on which something is founded: the basis upon which something stands or is supported . . . ." ■ Thus, we interpret the term "without foundation" as meaning baseless, groundless, or

without support. (See *Cummings v. Benco Building Services, supra*, 11 Cal.App.4th at p. 1387 [quoting a case that treated the terms "meritless," "groundless" and "without foundation" as synonyms].)

Notwithstanding this definition, the term "without foundation" remains ambiguous because there are different types of foundations for the positions a party takes in defending and litigating a suit. At its most fundamental level, a party's conduct in litigating a suit involves assertions of fact and contentions of law, which lead to further conduct—the party's arguments regarding the application of law to the facts. We will assume for purposes of this appeal that the term "without foundation" refers to both the factual and the legal bases for the positions taken by a party.

The foundation for an assertion of fact is evidence, which can be either direct or circumstantial. (CACI No. 202.) Thus, a party that asserts a fact without direct or circumstantial evidence to support it has engaged in conduct that is "without foundation" for purposes of section 809.9.

The foundation for a contention of law is legal authority such as a statute, regulation, or case law. (See *Finnie v. Town of Tiburon* (1988) 199 Cal.App.3d 1, 12–15 [244 Cal.Rptr. 581] [in applying Code Civ. Proc., § 128.5, court discussed separately lack of legal grounds and want of evidentiary showing].) Therefore, a party that takes a legal position without supporting authority, either direct or indirect, has engaged in conduct that is "without foundation."

Whether evidence is present in the record to support a factual assertion and whether authority has been presented to support a legal position are questions that both trial and appellate courts handle routinely in administering their caseload. The record of the proceeding will contain a party's (1) factual assertions and references to the evidence that supports those assertions and (2) legal positions and the authority cited to support those positions. Based on the nature of the inquiry and the record available, the existence of supporting evidence and authority can be determined as a matter of objective fact. Accordingly, we conclude that the question whether a party's conduct in litigating a suit was "without foundation" is an issue that the courts must decide as a matter of law under an objective test. As such, the issue is subject to independent review on appeal. (Cf. *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1274 [78 Cal.Rptr.3d 372] [application of objective test of reasonableness was subject to independent review on appeal].)

### D. *Unreasonable*

The edition of Black's Law Dictionary that was current when section 809.9 was enacted defines "unreasonable" to mean "[n]ot reasonable" and "[i]rrational." (Black's Law Dict. (5th ed. 1979) p. 1379.) Its definition of "reasonable" provides in part: "Having the faculty of reason; rational; governed by

reason; under the influence of reason; agreeable to reason. Thinking, speaking, or acting according to the dictates of reason." (*Id.* at p. 1138.)

The terms "reasonable" and "unreasonable" are used in a variety of legal contexts and do not always designate the same legal standard. Often, the terms reflect a negligence standard—that is, the failure to exercise the care a reasonable person would exercise under the circumstances. (E.g., *Massey v. Mercy Medical Center Redding* (2009) 180 Cal.App.4th 690, 694 [103 Cal.Rptr.3d 209]; see BAJI No. 3.10 [definition of negligence and ordinary care]; CACI No. 401 [standard of care for negligence]; see also *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 649 [183 Cal.Rptr. 508, 646 P.2d 179] [the term "frivolous" could impose an "objective standard [that] looks at the merits of the appeal from a reasonable person's perspective"].) Typically, the existence of negligence (the failure to exercise reasonable care) is regarded as a question of fact, and a finding of negligence is reviewed on appeal under the substantial evidence standard. (*Ermoian v. Desert Hospital* (2007) 152 Cal.App.4th 475, 500–501 [61 Cal.Rptr.3d 754].) Similarly, the application of a reasonableness standard in other situations is deemed a question of fact and reviewed for substantial evidence. (E.g., *Peak-Las Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 106 [90 Cal.Rptr.3d 775] [objective reasonableness in performing contract a question of fact; substantial evidence supported trial court's finding defendant's position was unreasonable]; *In re Joseph F.* (2000) 85 Cal.App.4th 975, 989 [102 Cal.Rptr.2d 641] [whether officer's use of force was objectively reasonable was a pure question of fact reviewed for sufficiency of the evidence].)

In other contexts the term "reasonable" has led to the adoption of a more specific standard of care and a different level of scrutiny when application of that standard is reviewed on appeal. California's Tort Claims Act (Gov. Code, § 810 et seq.) provides an example. Under that act, a defendant is entitled to recover its costs of defense if a claim is brought without reasonable cause. (Code Civ. Proc., § 1038, subd. (a).) Using the perspective of a hypothetical reasonable attorney, courts decide whether reasonable cause exists by (1) analyzing the facts known to the plaintiff when he or she filed or maintained the action and (2) determining whether any reasonable attorney would have thought the claim tenable. (*Laabs v. City of Victorville, supra*, 163 Cal.App.4th at pp. 1273–1274.) This any-reasonable-attorney standard is an objective standard that is applied as a matter of law. (*Id.* at p. 1274.) As such, its application is subject to independent review on appeal. (*Ibid.*)

The parties here do not advocate for any particular standard for use in determining whether conduct was unreasonable for purposes of section 809.9. Given this lack of argument from the parties, we will conduct an independent review and apply the any-reasonable-attorney standard as a matter of law. If

the conduct in question meets this standard, then the record also would contain substantial evidence supporting a finding of fact that the conduct was reasonable under an ordinary negligence standard.

 We recognize that, under the definitions we have adopted for the terms "without foundation" and "unreasonable," it is possible for a party's litigation conduct to qualify as both. In other words, the terms partially overlap. For example, when a party, after investigation and discovery, makes an assertion of fact without any direct or circumstantial evidence to support that fact, that conduct lacks foundation (is baseless or groundless) and is unreasonable (fails the any-reasonable-attorney standard) for purposes of section 809.9. It appears that the terms "without foundation" and "unreasonable" were used together to emphasize two different aspects of litigation conduct. The term "without foundation" seems to focus primarily on the base or grounds that underlie a party's position on a factual or legal matter. As a result, the term "unreasonable" appears to be concerned chiefly with the logic, rationale, or reasoning process that connects the underlying foundation with the conclusions advocated by the party.

### E. *Frivolous*

 Webster's Third New International Dictionary, *supra*, page 913 defines "frivolous" to mean "of little weight or importance : having no basis in law or fact: LIGHT, SLIGHT, SHAM, IRRELEVANT, SUPERFICIAL . . . ." We find this term ambiguous, because its plain and ordinary meaning does not indicate whether it imposes an objective standard, a subjective standard, or both. (See *In re Marriage of Flaherty, supra*, 31 Cal.3d at p. 649.) Furthermore, California case law has adopted more than one standard for the term "frivolous." Under Code of Civil Procedure section 128.7, for example, frivolity is determined using an objective standard. (*Burkle v. Burkle* (2006) 144 Cal.App.4th 387, 401 [50 Cal.Rptr.3d 436].) Elsewhere, courts have stated that the term includes both objective and subjective standards. (See *Millennium Corporate Solutions v. Peckinpaugh* (2005) 126 Cal.App.4th 352, 360 [23 Cal.Rptr.3d 500] [sanctions imposed for frivolous appeal].)

The ambiguity, however, has little practical significance in the context of the arguments presented by the parties here. For purposes of this appeal, we will adopt the definition used by Smith. In his view, a matter is frivolous if any reasonable attorney would agree it is completely without merit in the sense that it lacks legal grounds, lacks an evidentiary showing, or involves an unreasonable delay.

## F. Bad Faith

### 1. Ambiguity in the term

Black's Law Dictionary states that "bad faith" is the opposite of "good faith" and that bad faith conduct is "not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." (Black's Law Dict., *supra*, p. 127.) It also states " 'bad faith' is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will." (*Ibid.*)

Despite this definition's reference to the person's state of mind in general and the person's motive in particular, not all courts have construed the term "bad faith" as imposing solely a subjective standard. For example, the attorney fees provision of California's Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) uses the term "bad faith" and courts have interpreted it as imposing a two-prong standard: (1) objective speciousness and (2) subjective bad faith—that is, an improper motive. (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1275 [95 Cal.Rptr.3d 307] [Civ. Code, § 3426.4 refers to a claim of misappropriation "made in bad faith"].)

Alternatively, courts have referred to bad faith in other contexts as imposing a subjective standard and expressly distinguished it from an objective standard. (*Summers v. City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1070–1073 [275 Cal.Rptr. 594].) The definition of "bad faith" in the test for willful judicial misconduct sets forth a subjective standard that "entails *either* an intent, motivated by 'actual malice,' to commit an act that he knows or should know is beyond his lawful power *or* an intent to commit an act, even within his lawful power, 'for a corrupt purpose, i.e., for any purpose other than the faithful discharge of judicial duties.' [Citations.]" (*Doan v. Commission on Judicial Performance* (1995) 11 Cal.4th 294, 311 [45 Cal.Rptr.2d 254, 902 P.2d 272].)

Based on these different approaches to bad faith, we conclude that section 809.9's use of the term is ambiguous—that is, reasonably susceptible of more than one interpretation. (*Coburn v. Sievert, supra*, 133 Cal.App.4th at p. 1495 ["ambiguous" means susceptible of more than one reasonable interpretation].)

### 2. Bad faith is a subjective standard

SCH asserts that "bad faith" is a subjective standard and cites *Doran v. Magan* (1999) 76 Cal.App.4th 1287 [91 Cal.Rptr.2d 60] for the

proposition that a subjective standard "looks to the motives of the [party] and his or her counsel." (*Id.* at p. 1295.) Smith asserts that "bad faith" results from a party's improper motive. Based on the positions of the parties, and because objective standards are contained in the other three grounds listed in section 809.9, we conclude that the term "bad faith" establishes a subjective standard concerned solely with whether the motive underlying the losing party's conduct was improper. We further conclude that a party's conduct can be attributed to improper motives and, thus, constitute bad faith for purposes of section 809.9 even if that party's conduct could otherwise be found acceptable under the three objective criteria of section 809.9.

### 3. *What motives are improper?*

Black's Law Dictionary's definition of "bad faith" refers to "some interested or sinister motive" and states bad faith "contemplates a state of mind affirmatively operating with furtive design or ill will." (Black's Law Dict., *supra*, p. 127.)

Based on these definitions and the case law that adopts a subjective standard for bad faith, we conclude that conduct is improperly motivated for purposes of a bad faith standard under section 809.9 if it involves actual malice, ill will, or a purpose not related to the legitimate functioning of the hospital and its staff. Applying this definition to the facts in this case, we conclude that improper purposes would include, without limitation, personal animosity towards Smith, the intent to eliminate or hinder Smith as a competitor, and the intent to inflict harm, cost, and inconvenience on Smith because of his failure to sell or donate his clinics to Adventist Health.

### 4. *Effect of reasonable conduct*

One consequence of interpreting "bad faith" as imposing only a subjective standard is that a substantially prevailing party will be entitled to attorney fees and costs under section 809.9 when the losing party's conduct in defending or litigating the suit was taken because of an improper motive, *even if* the conduct could be seen as reasonable or supported by an adequate evidentiary and legal foundation. In other words, a hospital that defends a mandamus proceeding because it is motivated by improper considerations cannot avoid liability for attorney fees and costs simply by asserting legal positions for which it can find support.

This conclusion about the application of section 809.9 relates to a point raised during the hearing on the motion for attorney fees. Counsel for Smith argued that the defense of the mandamus proceeding "was very much in bad faith." The trial court responded: "Didn't they prevail, though, on some of

their opposition? You prevailed ultimately on the major issues, I guess, at the Court of Appeal, but for example, the cost bill, for example, there was an [*sic*] modification to that. There was, you brought some contempt issues, I did not find contempt."

 The fact that a hospital won some of the positions that it took during the litigation of the mandamus proceeding does not necessarily show that its defense of the mandamus proceeding was not in bad faith—that is, motivated by an improper purpose. First, we have interpreted section 809.9 to mean that the subjective standard of bad faith is separate and independent of the objective standards set forth in the other three terms. Second, if partial success on some issues was to be a reason for denying a motion under section 809.9, the statute would not have used the term "substantially prevailing party." The modifier "substantially" indicates that a party can be entitled to fees and costs without prevailing on all of the points raised in the litigation.

### 5. Evidence relevant to the factual question of motive

An inquiry into a party's state of mind and motives is a subjective one that poses a question of fact. (*Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 460 [69 Cal.Rptr.3d 789] [triable issue of fact existed regarding whether insurer revoked health plan in bad faith]; *Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1263 [116 Cal.Rptr.2d 358] [bad faith involves factual inquiry into party's subjective state of mind].)

The parties here disagree over a subsidiary question: Does the evidence relevant to proving SCH defended the mandamus proceeding in bad faith include SCH's prelitigation conduct? (See pt. V., *ante.*) During the hearing on the section 809.9 motion, SCH argued that the 2004 summary suspension of Smith's privileges at the hospital was "completely irrelevant" to the motion for attorney fees. In contrast, counsel for Smith argued the 2004 summary suspension was "relevant to show it was a bad faith defense . . . ." We agree with Smith.

 We begin with the basic proposition that "[a] subjective state of mind will rarely be susceptible of direct proof; usually the trial court will be required to infer it from circumstantial evidence." (*Knight v. City of Capitola* (1992) 4 Cal.App.4th 918, 932 [6 Cal.Rptr.2d 874].) Circumstantial evidence is relevant if it has any "tendency in reason to prove or disprove" the disputed fact, here SCH's state of mind in defending the writ proceeding. (Evid. Code, § 210.)

In the circumstances of this particular case, we conclude that evidence of prelitigation conduct is relevant to the question of bad faith. In particular,

evidence of the prior relationships and dealings between Smith and SCH and its affiliates is relevant to prove SCH's state of mind towards Smith and its motives for defending the mandamus action. That evidence includes the conflicts that existed between Smith and Adventist Health, which the record in this case indicates began in 1999. Thus, contrary to the assertions SCH made at the hearing on the motion for attorney fees, prior misconduct toward Smith is admissible as relevant evidence of SCH's improper motives or state of mind in the present proceeding. (See *Fox Valley Construction Workers v. Pride of Fox Masonry* (7th Cir. 1998) 140 F.3d 661, 667 [defense attorney's conduct in prior lawsuit against defendant was admissible to show strikingly similar practice in present lawsuit was done with sanctionable intent].)

Furthermore, the tendency-in-reason-to-prove standard of evidentiary relevance does not exclude evidence of conduct by SCH that occurred after the litigation of this suit. Evidence of subsequent conduct also might support reasonable inferences regarding whether SCH defended the mandamus proceeding because of ill will, a desire to lessen the competition from Smith, or a desire to punish him for not selling his clinics on the terms proposed by Adventist Health.

VII. *Application of the Objective Standards of Section 809.9*

A. *Conduct Subject to Scrutiny*

Whether SCH's conduct in defending the mandamus proceeding had a foundation, was reasonable, and was not frivolous depends on the positions it took in that proceeding.

In *Smith v. Selma Community Hospital, supra*, 164 Cal.App.4th 1478, this court identified four legal errors that SCH committed in deciding to terminate Smith's privileges. We summarized those errors as follows: "First, the governing board misinterpreted [the judicial review committee's] decision in a number of respects. For example, it wrongly concluded that the judicial review committee did not make the findings of fact required by the bylaws. Second, it erred in concluding that the judicial review committee considered irrelevant and inappropriate evidence. Third, it erred in concluding that the judicial review committee was obligated to accept as true the findings of the Hanford hospitals. Fourth, it misapplied the substantial evidence rule." (*Smith v. Selma Community Hospital, supra*, 164 Cal.App.4th at p. 1481.)

With respect to the mandamus proceeding, we stated that "[t]he most significant controversy between the parties concerns the legal effect of the findings of the Hanford hospitals." (*Smith v. Selma Community Hospital, supra*, 164 Cal.App.4th at p. 1503.) SCH's position on this controversy was

significant because it was intertwined with its commission of the four legal errors listed *ante*. Consequently, our analysis of SCH's "conduct in defending or litigating the suit" will begin with its position on that issue, which it stated as follows: " '[T]he [Selma Judicial Review Committee] was obligated to consider the Hanford factual findings as conclusively proven. [¶] Though this was set forth before the [Selma Judicial Review Committee], the Committee disregarded that position . . . . [¶] This required reversal by the Selma Governing Board.' " (*Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th at p. 1503.)

This is among the positions that we will analyze to determine whether a sufficient factual and legal foundation exists and whether the conclusions derived from those positions are reasonable.

B. *Analysis of Foundation*

1. *Factual foundation*

The primary factual assertions included in SCH's litigation position were the facts that (1) the Hanford hospitals reached decisions regarding privileges that were unfavorable to Smith, (2) the medical executive committee of SCH relied on those decisions in recommending the termination of Smith's privileges, and (3) the judicial review committee did not treat the decisions of the Hanford hospitals as conclusive. There is no dispute that these factual assertions were supported by an adequate factual foundation.[24]

Therefore, we find that the factual assertions by SCH were not "without foundation" for purposes of section 809.9.

2. *Legal foundation*

The legal foundation for the positions taken by SCH in conducting the litigation includes (1) the rules set forth in the bylaws of the medical staff of SCH, (2) the rules of law that govern the interpretation of written documents, and (3) case law concerning the peer review process, the exhaustion of administrative and judicial remedies, and collateral estoppel.

The case law is identified in the declaration of Jerry D. Casheros, the attorney who represented SCH in opposing the petition for writ of mandate

---

[24] The factual foundation for SCH's position consisted of the peer review decision of the Hanford hospitals and the peer review proceedings concerning Smith's privileges at SCH.

The Hanford hospitals conducted a peer review proceeding and produced two decisions that became effective on January 28, 2004. The proceeding and decisions of the Hanford hospitals are described earlier in this opinion and in *Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th at pages 1491 and 1492. In addition, the three stages of the peer review proceedings conducted by SCH are described in that opinion at pages 1493 through 1499.

before both the trial court and the Court of Appeal. Those cases are *Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61 [99 Cal.Rptr.2d 316, 5 P.3d 874], *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 [131 Cal.Rptr. 90, 551 P.2d 410], *Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123 [73 Cal.Rptr.2d 695], *Oskooi v. Fountain Valley Regional Hospital* (1996) 42 Cal.App.4th 233 [49 Cal.Rptr.2d 769], and *Webman v. Little Co. of Mary Hospital* (1995) 39 Cal.App.4th 592 [46 Cal.Rptr.2d 90].

Neither the rules nor the case law relied upon by SCH provides direct authority to support its position that the termination of a physician's privileges based solely on another hospital's peer review proceedings is per se "reasonable and warranted" for purposes of section 809.3, subdivision (b)(3). Conversely, however, no published California case has stated that it is always unreasonable and unwarranted for a hospital to terminate a physician's privileges based solely on another hospital's peer review proceedings.

The absence of direct authority authorizing or prohibiting SCH's termination of Smith's privileges based solely on the results of the peer review proceedings by the Hanford hospitals meant the parties had to support their specific position by presenting an analysis founded on general principles. We will evaluate the question whether that analysis was supported by an adequate legal foundation under the "unreasonable" criterion. We previously have recognized that there could be overlap between the three objective standards of section 809.9. (See pt. VI.D., *ante.*)

C. *Reasonableness of SCH's Legal Analysis*

1. *Reasonable exercise of discretion argument*

SCH argued that (1) the bylaws, specifically section 5.2.2 of the SCH Medical Staff Bylaws/Rules & Regulations (approved June 6, 2002) (Bylaws), granted its medical executive committee the discretion to consider a physician's conduct at another hospital; (2) its medical executive committee acted within that discretion when it based its recommendation solely on the results of the peer review proceeding of the Hanford hospitals; and (3) because the medical executive committee acted within its discretion, it follows that its recommendation was "reasonable and warranted" for purposes of section 809.3.

Based on the discussion that follows, we conclude the reasoning process contained in this argument by SCH is objectively reasonable because, at the time the argument was made, a reasonable attorney would have thought the argument tenable.

Section 5.2.2 of the Bylaws states that "[r]equests for clinical privileges shall be evaluated" based on a number of listed factors, including information

concerning clinical performance obtained from other institutions. SCH argued that this provision authorized the medical executive committee to terminate a physician's privileges based solely on occurrences at other institutions.

First, we conclude that section 5.2.2 of the Bylaws was ambiguous regarding the authority of the medical executive committee to rely solely on performance at other institutions in deciding whether to terminate a physician's privileges. Second, SCH's interpretation of the ambiguous provisions was neither unreasonable on its face nor rendered unreasonable by extrinsic evidence relevant to the meaning of section 5.2.2 of the Bylaws. Although SCH's interpretation did not prevail, it was reasonable nonetheless and represented a tenable argument for (1) why the medical executive committee's recommendation was reasonable and (2) why the judicial review committee erred in finding that the recommendation was unreasonable and unwarranted.

### 2. *Interpretation of judicial review committee's decision*

In *Smith v. Selma Community Hospital, supra*, 164 Cal.App.4th 1478, we upheld the judicial review committee's finding that the results of peer review proceedings at the Hanford hospitals, standing alone, did not provide a reasonable and warranted basis for terminating Smith's privileges. (*Id.* at p. 1482.) In reaching this conclusion, we interpreted the judicial review committee's written decision as meaning that, *in the circumstances of Smith's case*, it was unreasonable to rely solely on the other hospital's decision. (*Id.* at p. 1514.) We rejected a contrary interpretation of the judicial review committee's decision—that SCH's medical executive committee could never revoke a physician's privileges based solely on the adverse findings of another hospital. We discussed the ambiguity in the decision of the judicial review committee, however, and explicitly acknowledged that certain sentences in that decision "could be interpreted as SCH contends . . . ." (*Ibid.*) In other words, the ambiguity was reasonably susceptible of the interpretation advanced by SCH. Thus, it follows that the interpretation cannot be deemed objectively unreasonable for purposes of section 809.9.

### 3. *Conclusive effect of decisions of Hanford hospitals*

When SCH opposed the petition for a writ of mandate and appealed the grant of the writ, there was no California authority explicitly authorizing or prohibiting an acute care hospital from terminating a physician's privileges based solely on the results of the peer review proceedings of another hospital. The question presented here is whether SCH's position regarding the conclusive and binding effect of the decisions of the Hanford hospitals was justified by a reasonable argument for the extension of existing law.

Based on the argument presented in this appeal and this court's familiarity with the positions taken by the parties in the appeal on the merits of the writ petition, we conclude that SCH presented a tenable argument to support its position on an unresolved question of law. The advocated result was consistent with language used in some cases, and it was arguable whether that language should be applied to the context presented in this case. Therefore, its positions were not unreasonable for purposes of section 809.9.

### D. *Frivolous*

Smith argues SCH's defense of the writ petition was frivolous because it lacked legal grounds and an evidentiary showing. As we have stated in a previous part of this opinion, however, SCH's arguments concerning the conclusive effect of the Hanford decisions were not completely without merit. We therefore conclude the arguments also were not frivolous.

Smith also contends that SCH's defense was frivolous because SCH pursued the peer review proceeding solely because Smith refused to dismiss his lawsuit against it. Smith argues that this conduct violated the statutory requirement that a "governing body and the medical staff shall act *exclusively* in the interest of maintaining and enhancing quality patient care." (§ 809.05, subd. (d), italics added.) In support, Smith argues the judicial review committee found the hospital's pursuit of the peer review proceedings was "potentially financially motivated," which amounts to a finding that it was frivolous.

These arguments concern SCH's motives for defending the mandamus proceeding. Consequently, they will be addressed in our discussion of improper motives under the bad faith criterion that follows.

### VIII. *Trial Court's Determination of Bad Faith*

The trial court stated that Smith's motion for attorney fees was denied "pursuant to the court's holding in *Mir* . . . as the hospital's position was not frivolous, unreasonable, without foundation, or in bad faith pursuant to . . . section 809.9."

Our review of the trial court's determination regarding bad faith begins with considering (1) whether the trial court applied the correct standard for bad faith and (2) whether the trial court considered all of the evidence relevant to the inquiry into SCH's motives. Neither of these questions was addressed in the court's written order denying the motion. For the reasons that follow, we are concerned that the court may not have applied the correct standard and may not have considered relevant evidence.

## A. *Application of Correct Legal Standard*

No published decision, including *Mir*, has defined the legal standard used to determine whether a defendant's conduct in defending or litigating a lawsuit constitutes "bad faith" for purposes of section 809.9. As a result, the trial court did not have the benefit of precedent in deciding what standard to apply when making its determination regarding bad faith.

At the hearing on the motion for attorney fees, the trial court expressed concern that a hospital served with a mandamus action would be faced with the dilemma of capitulating or incurring liability for attorney fees. The court stated: "To avoid attorney's fees they would have had to say, 'Oh, my God, I cave in. I don't oppose it.' That can't be."

Under the subjective standard of bad faith contained in section 809.9, however, this is exactly the position in which a hospital that defends the lawsuit based on an improper motive is placed. If it chooses to defend the mandamus proceeding for an improper motive, then it is liable for the attorney fees and costs that the plaintiff incurred as a result of that defense, even if it is able to find objectively reasonable support for its conduct.

▪▪▪ Contrary to this standard, the trial court may have believed that liability for attorney fees was negated if the defendant won on some of the points taken during its opposition of the mandamus proceeding. During the hearing, the trial court asked counsel for Smith: "Didn't they prevail, though, on some of their opposition?" The court then mentioned the cost bill and the contempt proceeding and asked: "Are you saying that was all frivolous and in bad faith, too?" Under the standard of bad faith adopted in this opinion, a defendant's victories on some points raised during the lawsuit do not establish that the lawsuit was not defended for improper motives.

▪▪▪ In addition, the court noted the lack of guidance as to the applicable legal standard when it stated that it was not clear from the majority and dissenting opinions in *Mir* whether the elements set forth in section 809.9 were separate and independent. Although SCH acknowledged that bad faith presented a subjective inquiry, it then mixed in an objective component by arguing that it had a *reasonable* belief that its positions had merit.[25] Again, even if we assume that SCH reasonably believed some or all of its positions had merit, it does not necessarily follow that it defended the mandamus proceeding for proper motives.

---

[25] SCH presented only the declarations of its attorneys to support its opposition to the motion for attorney fees. The declarations that set forth the personal beliefs of the attorneys and an explanation of why their beliefs were reasonable are not direct evidence of the motives of their client.

Based on the lack of guiding precedent, the arguments presented to the trial court, and the transcript of the hearing, it appears that the trial court did not anticipate the legal standard for bad faith that is adopted in this opinion. These circumstances are sufficient to overcome the general presumption of correctness usually afforded a trial court's order. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 [86 Cal.Rptr. 65, 468 P.2d 193] [presumption of correctness is a general principle of appellate practice].) Consequently, we will remand so that the trial court can apply that legal standard to the relevant evidence.

### B. *Consideration of Relevant Evidence*

The parties do not agree on how the trial court treated evidence of SCH's prelitigation conduct in reaching its decision to deny the motion for attorney fees. From our review of the hearing transcript and the trial court's written order, we are unable to provide a definitive answer to this question. Because this matter will be remanded for further proceedings, it is not necessary for this court to decide this question. On remand, the parties and the trial court can be guided by our discussion of relevant evidence set forth in part VI.F.5., *ante*.

### C. *Determination of Bad Faith as a Matter of Law*

Smith contends the undisputed facts establish that both SCH's conduct in defending the writ proceeding and its postjudgment conduct were in bad faith. In effect, Smith is asking this court to apply a de novo standard of review and decide the issue of bad faith as a matter of law. Thus, Smith is requesting that this court decide he is entitled to attorney fees and costs and remand only for a determination as to the amount of the fees.

Based on these contentions raised by Smith, we will address whether the evidence of improper motives is so strong that it can be determined as a matter of law.

This is not one of those rare cases in which direct proof of the defendant's subjective state of mind was presented. Instead, the determination of SCH's motives will depend upon inferences drawn from circumstantial evidence. (See *Knight v. City of Capitola, supra*, 4 Cal.App.4th at p. 932.)

In Smith's view, "[t]he conclusive or indisputable facts demonstrate that SCH had an improper motive in both defending and litigating the writ proceedings." The facts Smith asserts are not in dispute include (1) the bargain SCH attempted to make in 2004 to obtain Smith's dismissal of a lawsuit in exchange for the hospital agreeing not to use the results of the

Hanford hospitals' disciplinary proceeding against Smith, (2) the decisions of four courts to reinstate Smith's privileges at hospitals operated by Adventist Health, and (3) the September 2002 decision of the superior court that characterized as "troubling" Central Valley General Hospital's "using the possibility of loss of hospital privileges as a bargaining chip in its efforts to secure favorable terms for the purchase of the licentiate's practice . . . ."

Although these facts support the inference that SCH decided to defend the mandamus proceeding based on an improper motive, we conclude that the inference is not necessarily compelled by the evidence. For example, the terms of the settlement offer reflected in the May 5, 2004, minutes of SCH's medical executive committee are difficult to reconcile with its later position in this litigation that patient safety required it to treat the findings made in the disciplinary proceeding of the Hanford hospitals as binding. Nevertheless, at least two inferences are possible. One inference is that the motives underlying the settlement offer were improper, but by the time SCH had to decide whether to defend this lawsuit, its motive had changed to a proper one. Alternatively, as argued by Smith, one can infer that the motives underlying the settlement offer were improper and that the same improper motives caused SCH to defend this lawsuit.

We will not decide that the inferences urged by Smith should be adopted as a matter of law on the record presented. Instead, the trial court, sitting as the trier of fact, should decide which inferences to draw in determining the factual question of motives after the parties have had the opportunity to present arguments using the legal standard for bad faith adopted in this opinion.

D. *Proceedings on Remand*

In *Mir*, the majority decided that the question whether the hospital's defense of the mandamus proceeding was unreasonable or without foundation for purposes of section 809.9 would be "redetermined pursuant to a noticed motion." (*Mir, supra*, 27 Cal.App.4th at p. 1487.) As guidance, the court stated that, as with motions generally, the conduct of the hearing on the motion was within the trial court's discretion and the hospital was not prevented "from subpoenaing and producing evidence and witnesses or otherwise defending against the request." (*Id.* at pp. 1487–1488.)

Here, we conclude that a similar approach should be employed. Prior to the first hearing, neither the parties nor the trial court had notice of (1) the legal standard for determining bad faith and (2) the evidence relevant to the application of that standard. As a result, the arguments and evidence were not developed using the subjective standard that focused on the defendant's

motives. For example, SCH argued its 2004 settlement proposal was not relevant. Consequently, it did not offer any evidence of the motives underlying the proposal, any explanation for how that proposal was consistent with its later position that patient safety necessitated the termination of Smith's privileges, or any evidence regarding a change in motives between when the proposal was made and when the decision was made to defend the lawsuit. By remanding this matter for a hearing on a noticed motion, SCH will not be disadvantaged by not knowing the exact standard that will be applied and will have an opportunity to present evidence that may affect the inferences that are drawn from their settlement proposal and other prelitigation conduct. Similarly, on remand neither the trial court nor Smith will labor under uncertainty regarding the applicable standard.

Therefore, in remanding this matter, we will direct the trial court to address the question of bad faith pursuant to a noticed motion that gives both parties the opportunity to present evidence relevant to the motives of SCH in (1) defending the lawsuit and (2) taking specific conduct in litigating the lawsuit.

### IX. *Judicial Notice of Entire Record of Prior Appeal*

In an order filed April 7, 2010,[26] this court notified the parties that it proposed, on its own motion, to take judicial notice of the *entire* appellate record in case No. F050816, which resulted in the opinion published as *Smith v. Selma Community Hospital, supra,* 164 Cal.App.4th 1478. The order gave the parties an opportunity to respond. (See Evid. Code, § 455, subd. (a).) Smith stated that he had no objection. SCH responded by asserting "to the extent that the appellate record includes the administrative record, such materials are irrelevant and not properly considered by this Court."

We reject SCH's theory of irrelevance as objectively unreasonable. First, the administrative record is relevant because it provides the factual foundation for the positions taken by the parties in the litigation. Second, it is relevant to the question of bad faith because SCH's conduct during the administrative proceeding provides circumstantial evidence regarding its motives in defending the mandamus proceeding. Accordingly, we grant our own motion and take judicial notice of the entire appellate record in the case No. F050816.

### DISPOSITION

The order denying attorney fees is reversed and the matter remanded to the trial court for further proceedings on the question whether Smith is entitled to

---

[26] The order granted SCH's motion for judicial notice filed November 4, 2009, and its motion to augment record on appeal filed October 13, 2009.

attorney fees and costs under section 809.9 on the ground of bad faith. The further proceedings shall include a noticed motion at which the parties shall have the opportunity to present evidence and arguments relating to the application of the subjective standard of bad faith set forth in this opinion. Smith shall recover his costs on appeal.

Levy, Acting P. J., and Kane, J., concurred.

A petition for a rehearing was denied September 27, 2010, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied December 1, 2010, S187224.