Filed 6/16/14  In re Isabelle G. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Isabelle G., a Person Coming Under the Juvenile Court Law. | |
| SAN MATEO COUNTY HUMAN SERVICES AGENCY,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>TIMOTHY G. et al.,<br><br>     Defendants and Appellants. | A139687<br><br>(San Mateo County<br>Super. Ct. No. 82914) |

Fifteen-month-old Isabelle was detained after her mother Catherine S. (Mother) left her home alone within reach of hazardous objects.  The San Mateo County Human Services Agency (Agency) alleged Isabelle was at a substantial risk of serious physical harm (Welf. & Inst. Code, § 300, subd. (b); hereafter § 300(b))[1] due to Mother's mental health issues and the inability of Isabelle's father, Timothy G. (Father), to adequately protect her.  The court overruled the parents' demurrer and sustained the Agency's petition.  We affirm.

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

1

# I. BACKGROUND

Because Mother and Father (Parents) challenge the court's orders overruling the demurrer and sustaining the petition separately, we consider the evidence before the court at the time of each ruling seriatim.

A.    *Evidence Before the Court at the Demurrer Hearing*

1.    *Isabelle's Birth and the Voluntary Services Plan*

In November 2011, the Agency received a referral that Mother had " 'delivered [Isabelle] . . . in the hospital room on her own, did not notify the nurses when she was pushing the baby out, pulled the newborn out by herself and then pulled out her own placenta. [Mother] required surgery to repair a tear in her membrane which she caused when she pulled out her baby and the placenta.' Following [Isabelle's] birth, [Mother] was placed on a [section] 5150 hold for 'grave disability.' . . . [Medical records] described [Mother] as 'actively psychotic upon giving birth[,]' " and as having " 'a probable psychotic mood disorder presenting . . . in postpartum with acute psychosis.' " The Agency investigated and found the allegations substantiated. Parents agreed to a voluntary services plan. Specifically, "[F]ather agreed to sign a safety plan[, which] outlined medication compliance for [Mother] and supervision of the child with [Mother] at all times by [Father]." The voluntary services plan ended in March 2012.

2.    *Period Following Voluntary Services*

Father worked from home as a lawyer and employed Mother as a paralegal. He "did not elaborate on supervision provisions" for Isabelle when he made court appearances.

Dr. Paul Wilson met with Mother in August 2012 and prescribed her Depakote, Prozac and Abilify. At that time, he reported that Mother was " 'clearly manic and in denial.' " On a scale of 1 to 10, he thought the child's risk while in Mother's care was a "7." He told Father of his concerns, and Father said he never left Isabelle with Mother unattended. Dr. Wilson, however, was concerned that Father minimized the risks posed by Mother's mental health problems.

2

In January 2013, the Agency investigated an allegation by Father that Mother had slapped Isabelle, but found the allegation unsubstantiated.

        3.      *February 28, 2013 Incident*

According to a police report, on February 28, 2013, at about 3:30 a.m. a San Mateo police officer saw Parents arguing on a street corner "approximately 1/4 mile from their residence . . . . Upon further investigation, [the officer] learned that they left their 16 month old daughter . . . alone and unattended in their residence at least 15 minutes prior to our contact. . . . [¶] [Another officer] . . . entered the residence and found Isabelle alone in a dark bedroom crying loudly. She was on an uncontained mattress on the floor and had access to the entire residence. There was an extremely hot floor heater 12 feet from the mattress that she could have burned herself on (or that could have caught fire in her parents' absence), a spray bottle of shower cleaner on the floor, as well as cigarettes and prescription medications that Isabelle had access to." The officers arrested Parents and detained Isabelle, who was examined and found to be well-developed and well-nourished except for diaper rash.

Later that day, Father told the Agency that he had left his home at about 2:00 a.m. after telling Mother he was going out to buy cigarettes. Mother followed to tell him something, but they were not arguing. Mother also denied they were arguing, but said it would have been worse to take the child with her when she went to talk to Father. She attributed the incident to a sudden lapse in judgment on her part. Mother reported that she was taking only Depakote and Prozac and was looking for a new psychiatrist. The home was cluttered and untidy.

The social worker wrote: Father "seems protective of [Mother] as he frequently assisted in completing [her] sentences when she was asked direct questions for points of clarity. He also presents as understanding, cooperative, and concerned about Isabelle's well being, while also being a bit guarded as to the relationship dynamics." Mother "appears dazed and seems to restate [Father's] sentiments." Her "affect and thought content did not appear to coincide[.] . . . [When] provided an opportunity to ask questions

[Mother] asked, 'what is the likely hood [*sic*] she will be adopted' " even though the social worker had not raised the possibility of adoption.

    4.    *Petition*

The following day, the Agency filed a juvenile dependency petition on behalf of Isabelle pursuant to section 300(b). The petition alleged that Isabelle "has suffered, or there is a substantial risk that [she] will suffer, serious physical harm or illness, [¶] . . . as a result of the failure or inability of . . . her parent . . . to supervise or protect the child adequately[;] [¶] . . . as a result of the willful or negligent failure of the child's parent . . . to supervise or protect the child adequately from the conduct of the custodian with whom the child has been left[;] [¶] . . . [¶] . . . by the inability of the parent . . . to provide regular care to the child due to the parent's . . . mental illness, developmental disability, or substance abuse."

Count b-1 alleged: "On February 28, 2013 at 2:30am, San Mateo Police observed [Parents] arguing on a public street approximately a quarter mile from their home and police subsequently determined that [Parents] had left the young child home alone. [Parents'] behavior placed the child at substantial risk of harm and neglect."

Count b-2 alleged: "On February 28, 2013 at 2:30am, San Mateo Police went to the home and found the fifteen month old child alone in a bedroom, lying on a mattress on the floor and crying loudly. The home was in disarray with debris, dirty diapers, prescription medication, cigarettes and various hazardous items such as a bottle of cleaning solution, and a small piece of plastic on the floor within reach of the child; further, a hot floor heater was in full operation close to the child and flammable items. The condition of the home and [Parents'] failure to adequately supervise the child placed the child at substantial risk of harm and neglect."

Count b-3 alleged: "[Mother] has a significant mental health history since she was a teenager including bouts of psychosis and multiple psychiatric hospitalizations and she has failed to maintain regular mental health treatment, in that had she last [*sic*] with her psychiatrist, [Dr. Wilson] in August 2012; further on February 28, 2013, Dr[.] Wilson states that [Mother] does not have insight as to her illness and does not appreciate the

4

reasons for taking the prescribed medications. [Mother's] ongoing mental health problems impact her ability to provide the care, protection and supervision the child needs; further, [Father] has left the child alone with [Mother] despite telling Dr[.] Wilson he [would not do] so.[2] [Mother's] mental health issues and [Father's] lack of protection places the child at substantial risk of harm and neglect in [Parents'] care[.]"

Count b-4 alleged: "[A]t the time of the child's birth, [Mother] was actively psychotic and was hospitalized pursuant to [section] 5150. The child was released to [Parents] with the condition that [Father] not leave the child alone with [Mother]. [Parents] engaged in Voluntary Services with the Agency from December 2011 to March 2012 to address [Mother's] mental health issues and [Parents'] lack of parenting skills; and despite completing the Voluntary Services [Parents] have been unable to maintain a safe home and adequately supervise and protect the child[.]"

    5.    *Demurrer*

On March 5, 2013, Parents filed a demurrer. They noted that section 300(b) requires proof that "[t]he child has suffered, or there is *a substantial risk* that the child will suffer, *serious physical harm or illness*," and authorizes jurisdiction "*only so long as is necessary to protect the child* from the risk of suffering serious physical harm or illness." (§ 300(b), italics added.) They argued: "Count b-1 does not indicate how long the child was left alone. . . . Count b-4 refers again to [M]other's mental health status, at the time of birth. The couple successfully completed voluntary services . . . ."[3] At the hearing on the demurrer, Parents' counsel further argued, "This was a very brief occurrence. Even if it was 24 minutes, half an hour, or two minutes that the child was

---

[2] An amended petition was filed on March 27, 2013. A change of the phrase "had not done so" to "would not do so" was the only change in the factual allegations. Other than providing Isabelle's full name, there were no other substantive changes in the petition.

[3] Parents also argued the allegations did not support the removal of Isabelle from the home. The issue before the trial court on the demurrer, however, was whether the allegations supported *jurisdiction*. Jurisdiction does not necessarily lead to removal. (See §§ 358, 361, subd. (c).) Whether there were sufficient grounds for removal was pertinent to the court's detention ruling, which is not challenged on appeal.

left alone. The child never left the bed and shows no risk. Children cry all the time, and then they stop crying all the time. And this child was very well cared for."

The court overruled the demurrer, explaining: "[T]he petition adequately gives notice to [Parents] of what the [Agency] believes brings the child within the jurisdiction of the Court. And I think it's clear what they're saying."[4]

B.    *Evidence Before the Court at the Jurisdiction and Disposition Hearings*

The Agency recommended the court declare Isabelle a dependent child and remove her from Parents' home. We summarize the additional evidence presented to the court on jurisdiction and disposition, both in the Agency's reports and at various hearings that took place before the jurisdictional ruling on June 28, 2013.

1.    *The Voluntary Services Plan*

Roberto Gonzalez was the case social worker during at least part of Parents' voluntary case plan following Isabelle's birth. He said the Agency's "big concern[,] aside from [M]other's mental health[,] was her lack of ability to bond with the child. . . . [M]other struggled with things like smiling to the baby, making eye contact, and [she] would not interact well with the child, and the child would not interact well with [her]. . . . [P]arents were cooperative and [Gonzalez] felt as though they were trying, but [he] stated 'I wasn't sure how much they really understood of what was going on.' "

Polly Gloudemans, a public health nurse, met with the family eight times during the voluntary services period. She reported that Mother had " 'serious mental health issues.' . . . [Gloudemans had] many concerns about [Mother's] interaction with the baby[,] most particularly how [Mother] held the baby and the fact that [Mother] rarely smiled at the baby." Mother at times was unable to concentrate on what Gloudemans was

---

[4] Immediately after ruling on the demurrer, the court heard substantial testimony and argument on the issue of detention. Because Parents do not challenge the court's detention ruling, this evidence is discussed in our review of the court's challenged jurisdictional findings. The court ordered Isabelle detained, commenting, "[T]he threshold is low. It's prima facie at this point. . . . [T]he Court finds that a prima facie case has been made. That the child is a person described by . . . section 350 [*sic*] B1, B2, B3, and B4."

saying. "I continually encouraged her . . . , but it was like she forgot, and the baby would be lying over her legs before long and arched backwards, head down and the legs down below her legs." At other times, however, Mother was very engaged, holding the baby correctly and smiling. "The medications she was taking . . . seemed to stabilize her at times."

Susan Farabee, a licensed clinical social worker, was Parents' therapist during the voluntary case plan. She also "had 'very serious' concerns about the mental illness of [Mother]. . . . [P]arents had poor insight as to the mental health of [Mother] and the impacts that lack of treatment [or] mental health services can have on the child. . . . [¶] . . . [O]ne of the major concerns [was about] bonding between [Mother] and the child. . . . [Farabee] had to repeat 'over and over' to [Parents] how to work on increasing bonding . . . and what bonding meant. . . . [Farabee] clearly remembered still having concerns about [Parents'] ongoing ability to have insight about mental health stability at the time the case was being closed."

When Gonzalez conducted unannounced home visits during the voluntary services period, he always found Isabelle in Father's care. Gloudemans testified that Isabelle was clean, well-nourished, and well cared for, and the house usually appeared very neat during the voluntary services period. The Agency did not advise Parents to alter the wall heater or hot water heater for Isabelle's safety. Gonzalez, Farabee and Gloudemans all reported that at the close of the voluntary services plan Mother was consistently taking her medication and had stabilized. Gloudemans, however, said she remained concerned that Mother would not continue to get treatment for her mental health condition or take her medication regularly and that Father would not ensure she did so.

Father testified that he never left Isabelle alone with Mother during the voluntary services period. He worked as an attorney four hours a day out of a home office, where he met with clients. While he worked at home, Mother watched Isabelle in the front room of the apartment, which was kept immaculate and had a play pen and toys for Isabelle. When Father went to court, he took Isabelle with him and placed her in day care at the courthouse. Father agreed that Isabelle should not have been left alone with

Mother during the voluntary services period because Mother "was just getting stabilized on medication." However, he said Gloudemans eventually told him she "didn't see anything wrong with leaving [Isabelle alone with Mother] when I was going to the store for some short period of time . . . in the future," after the voluntary services plan terminated.

2. *Interim Between Voluntary Services and Dependency Case*

After the voluntary services plan ended, Father testified he "never left" Isabelle home alone with Mother, "except recently" when Mother had "been doing very well," i.e., taking her medication and not having manic episodes. He would leave Isabelle with Mother only for short periods of time, such as for court appearances. Mother did not destabilize suddenly; it would occur over several hours. Father became protective again after Mother was seen by Dr. Wilson in the summer of 2012, but later felt it was again safe to leave Isabelle alone with her. No doctor or psychiatrist had ever told him not to leave Mother alone with Isabelle. Instead, Father told doctors that he did not leave Isabelle alone with Mother.

Mother had been seen by several doctors at Kaiser: Dr. Eden, just after Isabelle's delivery; Dr. Carey, mid-May to mid-June 2012; and Dr. Wilson for an emergency room consultation in June 2012 and outpatient treatment in August 2012. Father reported that the family lost their Kaiser coverage because they could not afford it. For a while, Father continued to buy Mother's medications through Kaiser at full price, but the prescriptions eventually ran out. They had found a new psychiatrist, Dr. Masaru Fisher, and Mother had an appointment with him scheduled for March 12, 2013.

Isabelle's pediatrician reported that Isabelle had been seen at two weeks, four weeks, two months, five months, and 14 months of age. Between visits in April 2012 and January 2013, Parents had made and cancelled many appointments. In June, they made a sick child pediatric appointment for Isabelle and came to the office, but then left without notifying anyone and never returned for the appointment.

Between May 2012 and January 2013, police responded to 10 reports of domestic disturbance or mental health concerns in Parents' home. Father testified that he made

most of those reports at times when Mother seemed unstable. In July 2012 and January 2013, for example, he summoned medical help for Mother. According to the Agency, Mother was placed on a section 5150 hold in June 2012 after a possible medication overdose, and again in July 2012 after committing a battery on Father (pushing his face with an open palm).

James O'Gallagher testified that he had known Father for about 20 years and he regularly talked to him about once a week. He had seen Isabelle with one or both Parents on about 20 to 25 occasions. Isabelle "always seemed to be fairly happy. . . . [¶] . . . I had a child myself. And I just saw the normal routines of parenting." Usually when he stopped by Parents' home in the mornings, Father was caring for Isabelle. Mother's interactions with the child seemed normal. There was occasional tension or arguing between Parents, but nothing significant. He had seen the bedroom in January or February and it "wasn't in pristine condition," but he considered it clean and did not see any items in the room that would be hazardous to a child.

3.     *February 28, 2013 Incident*

In an expanded police report, the investigating officer added that when Parents were stopped on the street Mother was barefoot, crying and shaking. She said Father had left the home during a verbal argument and she ran after him. They had been on their way back home when the police stopped them. Mother said she was fine and needed to get back to her baby, who was alone. Mother said "she had a moment of bad judgment and would never leave her baby again. . . . [She] appeared to be concerned about the consequences of her actions." Father "appeared to be extremely upset with [Mother] for leaving Isabelle alone and told us he would never leave his baby." At the home, a "strong odor of urine and mildew emitted throughout the residence as well as dirty laundry and several papers throughout the bedroom floor."

Father testified that he had left his home at about 2:30 a.m. to walk to Safeway. Before he left, he looked in on Mother and Isabelle and "kind of yelled I was going to the store . . . I didn't, you know, say it very loudly." Near the place where he was stopped by police, he heard someone calling his name and saw Mother running toward him. "I said,

'the baby, we got to get back. And she says, 'Yeah, I know.' It had only been . . . about no more than a minute or two from the time I left . . . [a]nd we were walking back . . . ." They were not arguing. "The police . . . immediately without any explanation whatsoever asked me to get against the car" and frisked Mother. Parents continued to protest that they had to get back to Isabelle, but the police told Father to "shut up." By the time the police called for back up and took Parents back home, Isabelle had been alone for about 12 minutes.

Father testified that Mother was not having "an episode" at the time of the incident and she had been taking her medications. At the detention hearing, the social worker confirmed these facts, and the court said, "as far as everything I've read, there's nothing to suggest that Mother was having any kind of mental health or psychotic incident[] that night."

Father consistently testified that the times and distances in the police report were inaccurate. The Agency eventually stipulated, based on police dispatch records, that Parents were stopped by the police at 2:25:55 a.m. on February 28, 2013, not 3:00 a.m. as stated in the police report. Parents also called a private investigator who testified that the distance from Parents' home to the place Parents were detained by the police was 650 feet and that it took him one minute and 50 seconds to walk the distance at a normal pace.

Social worker Olisha Hodges visited the home on February 28, 2013, and saw exposed wiring at the bottom of a water heater located in a bathroom just off the bedroom and through an open doorway. A private housing inspector testified that the water heater and its exposed wiring, which carried microvoltages to the heater's thermostat, were not hazards. Father testified that, before February 28, he had asked the landlord to put a door on the bathroom and the landlord had agreed, but had not followed through. In the bedroom itself, a wall heater rose several feet up the wall from floor level. The police report indicated the wall heater was hot to the touch, and Isabelle was able to at least crawl at the time of the incident. The housing inspector testified that the wall heater was rated for homes with people of all ages, was properly installed, and did not pose a fire

10

danger as long as items were at least six inches away from it. The front grille would get very hot when the heater was operating and touching it for more than three seconds would likely cause a superficial skin burn.

4. *Developments During Pendency of Dependency Case*

a. *Condition of the Home*

After the February 28, 2013 incident, Parents put child gates in front of the water heater and in the doorway to the room where the water heater was located. They cleaned up the floor of the bedroom, and called a plumbing company to look at the thermostat for the wall heater, which had been completely turned off. The housing inspector testified that he did not observe any hazardous conditions in the home when he inspected it on March 23, and the social worker reported that the home was clean when she visited on June 5.

b. *Mother's Mental Health*

The Agency reported that approximately 15 years earlier, Mother was declared a dependent child at about age 15 and remained under court supervision until she was 17. Mother's parents refused to care for her upon hospital discharge for a section 5150 hold. They stated Mother "was abusive towards herself and siblings and the parents felt overwhelmed . . . . [T]here were concerns that [Mother might] be abusing drugs . . . ." However, Mother had told the Agency she "never had any past history of psychotic episodes, or hospitalizations," and Father testified that both Mother and her mother had told him Mother had no such history as a teenager.[5]

Gloudemans testified that she was informed at the start of the voluntary services plan that Mother had had a psychotic break at Isabelle's birth and her global assessment functioning scale rating was 25 on a scale of 100, which was "extremely low." Dr. Eden diagnosed Mother at that time with a psychotic disorder, and Gloudemans said Father

---

[5] Mother refused to sign a consent form to give the Agency access to her past medical records. The court expressly ruled that Mother's exercise of her right, before a jurisdiction finding, not to release her own psychiatric records could not be held against her on the issue of jurisdiction.

told her early in the voluntary case plan that Mother had been diagnosed with bipolar disorder and was taking Lithium. In May or June 2012, Dr. Carey diagnosed Mother with a mood disorder.

In about August 2012, Dr. Wilson diagnosed Mother with a bipolar disorder and prescribed her Depakote, Prozac and Abilify. Mother, however, was adamant that she only had attention deficit disorder and she wanted to take only a stimulant, not the medication Dr. Wilson had prescribed her. In Dr. Wilson's opinion, Mother needed to accept her bipolar diagnosis, talk about her life and upbringing, and then move into therapy about maternal responsibilities. She needed ongoing treatment with a consistent provider. His primary concern was that Mother and Isabelle had not bonded, but Father appeared to be the primary caretaker and Isabelle seemed well cared for.

In March 2013, Dr. Fisher had seen Mother once and, based on her self-reported history, his diagnostic impression was that she did not have bipolar disorder. He adjusted her medications. On May 1, Dr. Fisher reported that he had seen Mother three times. He had diagnosed her as having anxiety and attention deficit hyperactivity disorder, not bipolar disorder. Regarding her reported breakdown at Isabelle's birth, Dr. Fisher opined that it was "entirely conceivable that an individual with a diagnosis of attention deficit hyperactivity disorder, once off medications ([i.e.,] for the duration of pregnancy)[,] might present with symptoms of disorganization, but once back on treatment should be able to fully function." However, he acknowledged it was " 'challenging in working with [Mother] as she is not a good historian and it is difficult to really understand what is going on.' " He prescribed her Ativan, Adderall, and Klonopin. She later reported that she had lost two of the medications, and Dr. Fisher said he would no longer prescribe Mother medication because he was concerned that she might be misusing her medication.

In May 2013, Mother failed to appear at two court hearings. On the first occasion, Father reported that she was having an anxiety attack, and on the second he said she "hasn't even been able to get out of bed[,]" and " I think . . . she has just been overwhelmed by this." He had contacted Dr. Fisher and scheduled her an appointment for late May. Dr. Fisher reported that he saw Mother on May 28 and she seemed to be

12

"suffering from an underl[y]ing increase in paranoia [which] can occur as episodes when things appear to be somewhat unstable." He did not believe it was long-term paranoia, but he would monitor her response to medication (Prozac only) and possibly adjust her prescriptions. After a visit on June 11, he questioned her stability, but was reassured when she seemed stable in two phone conversations later in June. Dr. Fisher opined that Mother had attention deficit disorder, possibly with psychotic disorders not otherwise specified. However, he was still unsure because she presented very differently at each appointment. He prescribed her Risperdone as an additional medication, and said it would take time to see if it stabilized her. He thought it would be difficult to ensure she fully cooperated with services. In June, Mother resisted an Agency recommendation that she undergo a mental health assessment and participate in therapy, claiming she was already receiving therapy from Dr. Fisher. Dr. Fisher, however, reported that he only consulted with Mother about medication and did not provide therapy.

In late June 2013, Father testified that Mother's new medication was helping her significantly. In his view, Mother had become more stable since seeing Dr. Fisher. Social worker Morales-Cruz also testified that Mother seemed "more responsive" after having been on her new medication for awhile. However, she thought Mother was not stable and noted that Mother had been uncooperative throughout the dependency case.

c.    *Father's Minimization of Mother's Mental Health Problems*

Father vigorously opposed court intervention early in the dependency case. On April 30, 2013, he told the social worker that they were "now ready to move forward and cooperate in services," and he reiterated in June that he was willing to participate in services. Morales-Cruz said in late June that Father had been uncooperative during most of the case and had only recently changed his attitude. She remained uncertain whether he would engage in services or accurately report what was happening in the home.

Dr. Wilson reported, based on an August 2012 visit he had with Parents and Isabelle, that Father seemed to understand that Mother had bipolar disorder and said he did not leave Isabelle alone with Mother. However, Dr. Wilson was concerned that Father had "been 'too passive given the severity of the issues' in not ensuring that

13

[Mother] receives ongoing consistent help." In March 2013, Father told the Agency that Mother had bipolar disorder, but soon thereafter he said he no longer accepted the diagnosis based on his own independent research. He claimed Mother "presented 'odd' " because of the bipolar medication she was taking. In late June 2013, Father acknowledged that Mother had significant mental health problems. "I don't think she's schizophrenic or anything, but she does have problems, yeah, depression." Father said he always contacted a doctor when Mother was unstable, and he noted that he had immediately informed the Agency of an incident during a June 7 visit with Isabelle (discussed further *post*). Father consistently testified that he would not leave Isabelle alone with Mother if court-ordered not to do so or Mother appeared unstable.

Dr. Fisher reported in June 2013 that Parents "appear[ed] to be 'inseparable' but he [could] also sense a little bit of tension." It was a complicated situation that he had not had enough time to assess. Father was very patient with Mother and "handl[ed] her behaviors well given the situation." Dr. Fisher believed Father "would let it be known if the child were in an unsafe environment." Dr. Fisher also opined that "with [Father] in the picture things could be safe, but [he would have] to be actively in the picture taking on the majority of the responsibility."

### d.    *Isabelle's Development*

In March 2013, the foster father with whom Isabelle had been placed reported that Isabelle would "present with sudden onset 'almost like tantrums' . . . where the child will suddenly begin to scream and cry uncontrollably . . . when the home is quiet, the child is left alone for naps/bedtime, and when she is unable to locate the foster mother in[ ]sight." Farabee reported that Isabelle "presents with a flat affect, low language skills . . . . Triggers for her in the foster home appeared to be when there were loud voices (she would cover her ears and eyes and retreat), when the house was completely silent (she would scream loudly) and feeling as if she would be left alone (she would scream loudly)." Gloudemans reported similar observations.

While in foster care, Isabelle eventually stabilized, made developmental gains, and tolerated frustration. In April 2013, Farabee reported: "Isabelle is a very bright and

14

resilient 17 month old child who is trying very hard to form relationships with other adults, exploring new toys and interacting with other children, and increasing her language skills." When she came into foster care, she had a fungal infection due to prolonged diaper rash, but the area healed with treatment. She was assessed for speech and motor delays and did not qualify for services at that time. In June, the Agency reported that Isabelle was doing very well in foster care and was meeting all of her developmental milestones. "The child is very loving and can interact well with other children and adults . . . ."

        e.     *Visitation*

At a March 5, 2013 visit (five days after Isabelle's initial detention), Isabelle "took about 25 minutes to 'warm up' to [Mother] and did not want to be held by [her]. . . . [F]ather . . . was noted to prompt, direct and coach [Mother] during the entire visit on how to interact with the child. . . . [M]other was unable to freely interact with the child without having [Father] guide her step by step[,] to the degree [that Father] instructed [Mother] to kiss the child good bye at the end of the visit." Isabelle, however, was responsive and receptive to Father. At a March 13 visit, Isabelle again gravitated toward Father, who played with her. "[M]other paced around the room during most of the visit complaining it was too warm. . . . [F]ather had to tell [Mother] to play with the child and interact with her . . . ." Also, "[P]arents had to be told to change the child's diaper halfway through their two hour visit . . . [and] appeared to have difficulty remaining in the supervised visitation room with the child for the duration of the two hour visit . . . ."

At an April 1, 2013 visit, Father asked to hold the child and Mother refused. Father then asked to terminate the visit and left the room. Mother tried to follow him with Isabelle in her arms but staff blocked her. Staff were able to deescalate the situation and Father returned. During a mid-April visit, "[Isabelle] actively tried to avoid eye contact with her father. . . . [W]hen [F]ather would try to engage her, she would turn . . . to engage [Farabee and the visitation supervisor]. At times, it appeared as if Isabelle was trying to avoid physical contact with [Father]. . . . [Father] played with [Isabelle] on the floor and [she] would babble with [him]." In other visits, Parents continued to bicker,

and it was observed that Mother "does not interact much with the child and [Father] expresses frustration toward [Mother]. . . . [Father] attempts to coach her through the entire visit as to how to interact with the child." Father also asked visitation supervisors to omit information from visitation reports, and "attempt[ed] to push boundaries, intimidate staff and argue[] for special treatment." Parents also had to be repeatedly reminded not to use their phones during visits.

At a June 7, 2013 visit, Mother arrived an hour late and confronted Father in front of Isabelle about where he had spent the previous night. Father said " 'not here not now' but [Mother] was clearly unable to control her anger and grabbed [Father] in front of Isabelle, [Father] asked her to stop, but [Mother] then proceeded to push [Father] and reach for his face. [Isabelle] had to be taken to a separate room as she was crying and distressed over what she had witnessed. The visit was terminated and the police were called to respond." Mother was placed on a section 5150 hold and subsequently released. Father testified that Mother "was unstable at that time" and had not taken her medication. He refused to engage in the argument Mother had tried to start during the visit, and he reported the incident to the social worker without delay.

During a June 14, 2013 developmental assessment of Isabelle, the child "avoided [Mother] and did not want [Mother] to touch her, hug her, or look at her. The child sought comfort in [Father,] and [Mother] continued to pry at the child to get her to interact with her even though [Father] would ask [Mother] to leave the child alone." When Father asked Mother to stop interfering with the assessment, Mother "became angry. The child also became so upset and cried so much that she threw up during the assessment. [Parents] did not understand why the child had thrown up until [the pediatrician] explained it was due to her being upset."

5.      *The Court's Ruling*

The court amended the petition to conform to proof. As to count b-1, the court changed "a quarter mile" to "650 feet," "diapers" to "diaper," and "cigarettes" to "cigarette," and struck "prescription medication" (which, according to photos, was on top of the water heater and not within Isabelle's reach). The court then found by a

preponderance of the evidence that the petition allegations, as amended, were true. The court held the Agency failed to establish the need for removal by clear and convincing evidence and ordered the immediate return of Isabelle to Parents' home. The court ordered the Agency to provide protective day care for Isabelle as needed to allow Father to attend court hearings in his work as an attorney.

## II.    DISCUSSION

A.    *Demurrer to Petition*

Parents argue the court erred in overruling their demurrer to the petition. We affirm.[6]

A petition must contain "[a] concise statement of facts, separately stated, to support the conclusion that the child upon whose behalf the petition is being brought is a person within the definition of each of the sections and subdivisions under which the proceedings are being instituted." (§ 332, subd. (f).) "[A] facially sufficient petition . . . does not require the pleader to regurgitate the contents of the social worker's report into a petition[;] it merely requires the pleading of essential facts establishing at least one ground of juvenile court jurisdiction." (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 399–400.) "We construe well-pleaded facts in favor of the petition [citation] . . . ." (*Id.* at p. 397.)

When the court overruled the demurrer, it stated, "[T]he petition adequately gives notice to [Parents] of what the [Agency] believes brings the child within the jurisdiction of the Court. And I think it's clear what they're saying."[7] We infer that the court

---

[6] The Agency argues the claim is forfeited because Parents never demurred to the operative petition, i.e., the amended petition filed on March 27, 2013. The court held a hearing on Parents' demurrer to the original petition, and the court overruled it. The later amended petition made only immaterial changes as explained in footnote 2, *ante*. It would therefore have been futile for Parents to renew their demurrer to the amended petition. Consequently, their argument is not forfeited. (See *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1001 ["[t]here is a general exception to the forfeiture rule for instances when an objection would have been futile"].)

[7] The language used by the court appears to be based on a passage in Seiser & Kumli, Cal. Juvenile Courts Practice and Procedure (2014) § 2.42[1], p. 2-84.

17

concluded that the petition stated facts that, if true, would bring Isabelle within the jurisdiction of the court as a juvenile dependent. We affirm that ruling.

Parents analyze each section 300(b) factual allegation separately and argue that none established the requirements of section 300(b) jurisdiction. They further argue we must strike any allegations that failed to support jurisdiction, even if other allegations support it. However, we believe that the court was free to overrule the demurrer based on a conclusion that the factual allegations *collectively* demonstrated that Isabelle came within the court's jurisdiction.

Section 300(b) authorizes juvenile dependency jurisdiction where "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of" four categories conduct or disability of her parents: "[(1)] the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or [(2)] the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or [(3)] by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or [(4)] by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." "The plain and ordinary meaning of the word 'or' is well established. When used in a statute, the word 'or' indicates an intention to designate separate, disjunctive categories. [Citations.]" (*Smith v. Selma Community Hospital* (2010) 188 Cal.App.4th 1, 30.) However, the categories need not be read as mutually exclusive, but may have overlapping meanings. (*Ibid.*) Moreover, a combination of the categories might satisfy the statute. "[F]rom a practical point of view, the scope of a particular [category] is not as important as the scope of the statute." (*Ibid.*) Thus, whether Parents failed to supervise or protect Isabelle, or were unable to provide regular care due to Mother's mental illness, is not as important as whether their alleged conduct or disabilities, *considered collectively*, caused Isabelle to suffer or be at a substantial risk of suffering serious physical harm.

18

The petition's allegations, accepted as true, collectively demonstrated that Isabelle came within the jurisdiction of the juvenile court. The petition alleged that Parents left 15-month-old Isabelle alone at home while they walked a quarter-mile away from their home. This allegation supports the inference that Isabelle was left alone for a period of time in which she could have injured herself. Although the court later found that the initially reported distance was inaccurate, Parents' demurrer challenged the legal sufficiency of the allegations in the petition, not their factual accuracy. The petition further alleged that the child had access to specific hazards in the home, including prescription medication, cleaning solution, small items that could be swallowed, and a "hot floor heater." A 15-month-old child could certainly suffer serious physical harm if she touched or ingested such items. The petition then alleged that Mother had serious mental health problems that were not controlled and that Father had left the child alone with Mother despite prior assurances he would not do so. The detention report clarified that Father had left Isabelle alone with Mother on February 28, 2013, and Mother then made the decision to leave the child home alone. Thus, when the petition and report were read together, Parents were on sufficient notice that the Agency alleged Isabelle was at a substantial risk of serious physical harm because Mother had mental health problems that had led, and might again lead, to her leaving Isabelle alone in hazardous circumstances, and Father could not be trusted not to leave the child alone with Mother. Those allegations, if proven, stated a ground for jurisdiction under section 300(b). Thus, the court properly overruled the demurrer.

B.    *Sufficiency of Evidence to Support Jurisdiction*

Parents next argue the Agency did not produce substantial evidence of the truth of allegations sufficient to support jurisdiction under section 300(b). We disagree and affirm.

1.    *Lack of Bonding Between Mother and Isabelle*

As a preliminary matter, we note that the evidence that Isabelle was not emotionally bonded with Mother, which is cited extensively in the Agency's brief on appeal, was not relevant to the court's jurisdiction findings because lack of bonding was

19

not alleged in the petition.  Although the court said during the jurisdiction hearing, "It's abundantly clear . . . that this child does not appear very attached to [M]other," it expressly found the evidence irrelevant to the jurisdiction issue.  Similarly, emotional damage to Isabelle due to the alleged conduct of Parents could not establish jurisdiction because section 300(b), the only alleged ground for jurisdiction, requires a showing of serious *physical* harm or a substantial risk of such harm.  (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 716 ["a finding of 'emotional harm' will not support jurisdiction under subdivisions (a) or (b)"; domestic violence between parents]; *In re Janet T.* (2001) 93 Cal.App.4th 377, 389 ["lack of education may well cause psychic or emotional . . . harm[,] [b]ut there are no facts alleged . . . to indicate mother's failure to ensure the children's regular school attendance subjected the children to physical injury or illness, serious or otherwise"]; see *id.* at pp. 387–388 [1987 amendments to § 300 narrowed the grounds for jurisdiction by adding requirement that agency show "concrete harm or risk of physical harm to a child"].)[8]

> 2.       *Counts b-1 and b-2:  The February 28, 2013 Incident*

As amended to conform to proof, the factual allegations of counts b-1 and b-2 were:  "On February 28, 2013 at 2:30am, San Mateo Police observed [Parents] arguing on a public street approximately [650 feet] from their home and police subsequently determined that [Parents] had left the young child home alone.  [Parents'] behavior placed the child at substantial risk of harm and neglect. [¶] . . . San Mateo Police went to the home and found the fifteen month old child alone in a bedroom, lying on a mattress on the floor and crying loudly.  The home was in disarray with debris, [a] dirty diaper[], [a] cigarette[] and various hazardous items such as a bottle of cleaning solution, and a small piece of plastic on the floor within reach of the child; further, a hot floor

---

[8] When it ordered Isabelle detained, the court cited emotional harm (actual or potential) as a basis for its ruling, even though jurisdiction was alleged only on the basis of section 300(b).  Indeed, the court added "emotional" in handwriting to preprinted grounds for detention that were based on section 300(b) and thus only referred to physical harm.  However, as noted *ante*, the court's detention ruling is not challenged on appeal.

heater was in full operation close to the child and flammable items. The condition of the home and [Parents'] failure to adequately supervise the child placed the child at substantial risk of harm and neglect."

At the jurisdiction hearing, the court expressly found Father had been out of the apartment for less than two minutes when he noticed Mother had followed him. "[S]ignificantly," the court found, it was about "600 feet. One minute, 50 seconds. In other words, it was just very close to the apartment." Regarding the condition of the home, the court expressly found credible the housing inspector's testimony that at the time of inspection neither the wall heater nor the water heater posed a safety hazard. The court also found the family friend O'Gallagher credible, who testified that Parents' home appeared clean to him. The social worker testified the home was clean during a June 2012 home visit, and Gloudemans testified that during the voluntary services period the home was "very neat" a majority of the time. Parents had been subject to unannounced home visits during the voluntary services period and there were no reports the home was unsafe; moreover, they were not advised to change the wall heater or water heater.

The record thus strongly suggests that the court did not find that the February 28, 2013 incident alone indicated there was an ongoing risk that Parents would leave Isabelle home alone or expose her to hazardous conditions in the home. Indeed, when the court explained its jurisdictional findings, it focused instead on Mother's behavior, particularly with regard to the June 7, 2013 supervised visit. We therefore now turn to consider whether the facts of the February 28, 2013 incident, in combination with other evidence about Parents' behavior, supported an inference that Isabelle was at a substantial risk of serious physical harm.

3.    *Counts b-3 and b-4: Mother's Mental Health Issues and Father's Response*

The factual allegations of count b-3 and b-4, restated in chronological sequence, were the following: "[Mother] has a significant mental health history since she was a teenager including bouts of psychosis and multiple psychiatric hospitalizations . . . ."

(Count b-3.) "[A]t the time of the child's birth, [Mother] was actively psychotic and was hospitalized pursuant to [section] 5150. The child was released to [Parents] with the condition that [Father] not leave the child alone with [Mother]. [Parents] engaged in Voluntary Services with the Agency from December 2011 to March 2012 to address [Mother's] mental health issues and [Parents'] lack of parenting skills; and despite completing the Voluntary Services [Parents] have been unable to maintain a safe home and adequately supervise and protect the child[.]" (Count b-4.) "[Mother] has failed to maintain regular mental health treatment, in that had she last [*sic*] with her psychiatrist, Paul Wilson, MD in August 2012; further on February 28, 2013, Dr. Wilson states that [Mother] does not have insight as to her illness and does not appreciate the reasons for taking the prescribed medications. [Mother's] ongoing mental health problems impact her ability to provide the care, protection and supervision the child needs; further, [Father] has left the child alone with [Mother] despite telling Dr. Wilson he [would not do] so. [Mother's] mental health issues and [Father's] lack of protection places the child at substantial risk of harm and neglect in [Parents'] care[.]" (Count b-3.) While conflicting evidence was presented as to Mother's mental condition, substantial evidence supports these allegations and the exercise of jurisdiction over Isabelle.

Substantial evidence supports a finding that Mother had serious and ongoing mental health problems: the incident at Isabelle's birth, multiple (though conflicting) diagnoses of mental illness, multiple observations of her flat affect and distraction, and Father's admission that she had mental health issues. The evidence also showed that Mother was not yet on an effective regular treatment regimen for her condition. While Mother's ability to obtain effective treatment was complicated by insurance coverage interruption and diagnostic disagreements, absence of effective treatment nevertheless contributed to a risk of harm to Isabelle. Mother remained unstable because she had not yet found, and had not yet showed an ability to abide by, an effective treatment regimen.

There was also substantial evidence that Mother at times lashed out at Father when she became upset or unstable. The court found Parents were arguing when stopped by the police on February 28, 2013. Father testified that most of the 10 police calls during

22

the interim period between voluntary services and the dependency case were prompted by Mother's instability. In at least one of those incidents, Mother allegedly physically attacked Father and in another Father believed she had struck the child. Although the latter allegation was unsubstantiated, the circumstances suggested heightened discord that convinced Father he needed police intervention. Even more concerning were the incidents of conflict during visits that were directly observed by current service providers. At the April 1 visit, a dispute between Parents escalated into Father's walking away from the visitation site and Mother's attempt to follow him with Isabelle in her arms. At the June 7 visit, Mother angrily confronted Father, grabbed and pushed him, and then reached for his face before she was stopped. She did so despite Father's pleas for her to calm down and wait to discuss the issue at a more appropriate time. At Isabelle's June 14 developmental assessment, Mother again became angry when Father tried to redirect her and Isabelle became so upset that she vomited. These incidents were recent, confirmed by third party observation in a supervised setting, and particularly disturbing because it was reasonable to infer that such behavior and conflicts, absent supervision, could pose an even greater risk to the child.

Indeed, the court clearly indicated that the latter incidents weighed heavily in its assessment of a current risk to Isabelle. The court specifically commented that the June 7, 2013 incident was "very troubling." Mother "doesn't appear to have the ability to manage her emotions," despite Father's efforts to redirect her. "[I]n my view it's [M]other that's aggressive towards [F]ather and [Father] does what he can to calm her, but it's difficult." The court observed that Father was caring for both Isabelle and Mother, and sometimes he could not manage Mother due to no fault of his own. "I don't think it's viable to ask [M]other to move out of the house given what I understand of the dynamics in the family . . . ." Mother's counsel implicitly acknowledged that Mother could not move out and Father's counsel did not dispute that position.

In sum, the evidence clearly demonstrated Mother's continuing mental instability and resulting propensity to lash out; Mother's inability to care for Isabelle alone; Isabelle's heightened risk of injury due to inattention because she was a child less than

23

two years old;[9] and Father's inability to reliably protect Isabelle from the consequences of Mother's instability.  Those facts constituted substantial evidence that Isabelle faced a substantial risk of serious physical harm.

### III. DISPOSITION

The jurisdiction and disposition order is affirmed.

---

[9] See *In re Rocco M.* (1991) 1 Cal.App.4th 814, 824.

_____
Bruiniers, J.

We concur:


_____
Simons, Acting P. J.


_____
Needham, J.


A139687